# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2013AP1437-CR |
| COMPLETE TITLE: | State of Wisconsin,<br>            Plaintiff-Respondent-Petitioner,<br>    v.<br>Hatem M. Shata,<br>            Defendant-Appellant. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
(Reported at 356 Wis. 2d 326, 855 N.W.2d 491)
(Ct. App. 2014 – Unpublished)

| | |
|---|---|
| OPINION FILED: | July 9, 2015 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | April 21, 2015 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Milwaukee |
| JUDGE: | Timothy G. Dugan |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | BRADLEY, ABRAHAMSON, J.J., dissent. (Opinion Filed.) |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the plaintiff-respondent-petitioner, the cause was argued by *Nancy Noet*, assistant attorney general, with whom on the briefs was *Brad Schimel*, attorney general.

For the defendant-appellant, there was a brief by *Amelia L. Bizzaro* and *Bizzaro Law LLC*, Milwaukee. Oral argument by *Amelia L. Bizzaro*.

An amicus curiae brief was filed by *Stacy Taeuber* on behalf of the University of Wisconsin Law School, Immigrant Justice Clinic. Oral argument by *Stacy Taeuber.*

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2013AP1437-CR
(L.C. No. 2012CF1757)

STATE OF WISCONSIN      :      IN SUPREME COURT

**State of Wisconsin,**

      **Plaintiff-Respondent-Petitioner,**

  **v.**

**Hatem M. Shata,**

      **Defendant-Appellant.**

**FILED**

**JUL 9, 2015**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Reversed.*

¶1 ANNETTE KINGSLAND ZIEGLER, J. This is a review of an unpublished decision of the court of appeals,[1] which reversed the Milwaukee County Circuit Court's[2] judgment of conviction and order denying Hatem Shata's ("Shata") post-conviction motion to withdraw his guilty plea to one count of possession with intent to deliver marijuana, as party to a crime.

---

[1] State v. Shata, No. 2013AP1437-CR, unpublished slip op. (Wis. Ct. App. July 15, 2014).

[2] The Honorable Timothy G. Dugan presided.

¶2 Shata argues that the circuit court erred by denying his motion to withdraw his guilty plea. He argues that he should be allowed to withdraw his plea on the basis of ineffective assistance of counsel under Padilla v. Kentucky, 559 U.S. 356 (2010).

¶3 Specifically, Shata argues that, under Padilla, his trial counsel performed deficiently by failing to inform him that he would be subject to "mandatory" deportation if convicted.[3] Although trial counsel did inform Shata that he faced a "strong chance" of deportation if convicted, Shata argues that this advice was deficient because trial counsel should have told him that "his conviction would absolutely result in deportation." Shata argues that immigration law clearly provides that he would have been subject to mandatory deportation upon conviction. Shata argues that this deficient performance prejudiced him because he would have insisted on going to trial had he known that the guilty plea would subject him to mandatory deportation. He argues that deportation has

---

[3] In his brief, Shata argues that his deportation is "mandatory" under 8 U.S.C. § 1227(a)(2)(B)(i). However, the Supreme Court has described deportation under that statute as "presumptively mandatory." Padilla v. Kentucky, 559 U.S. 356, 368-69 (2010). That statute does not state that deportation is "mandatory." Rather, it states that certain aliens "shall, upon the order of the Attorney General, be removed . . . ." 8 U.S.C. § 1227(a)(intro.). The Attorney General has some discretion to prevent deportation. Padilla, 559 U.S. at 363-64. Further, as we will explain later, the United States Department of Homeland Security exercises prosecutorial discretion as to which aliens it will seek to deport.

been his primary concern throughout this case because he has lived in the United States for 22 years and does not want to be separated from his children and wife, who live in New Jersey.

¶4 The State argues that the circuit court correctly denied Shata's post-conviction motion because his trial counsel did provide effective assistance. The State argues that Shata's attorney did not perform deficiently. The State contends that under Padilla, Shata's attorney was merely required to inform him that he was at risk of being deported if convicted. The State argues that Shata's attorney went above and beyond that requirement by telling Shata that he faced a "strong chance" of deportation. The State argues that Shata's conviction made him "deportable" but did not make his deportation an absolute certainty. The State also argues that, if Shata's counsel performed deficiently, Shata was not prejudiced thereby. The State argues that Shata would have pled guilty even if he had been told that deportation was an absolute certainty upon conviction. Alternatively, the State argues that this court should remand the matter to the circuit court for a hearing on the issue of prejudice.

¶5 We conclude that Shata is not entitled to withdraw his guilty plea because he did not receive ineffective assistance of counsel. Specifically, Shata's attorney did not perform deficiently. Shata's attorney was required to "give correct advice" to Shata about the possible immigration consequences of his conviction. Padilla, 559 U.S. at 369. Shata's attorney satisfied that requirement by correctly advising Shata that his

3

guilty plea carried a "strong chance" of deportation.  Shata's attorney was <u>not</u> required to tell him that his guilty plea would absolutely result in deportation.  In fact, Shata's deportation was not an absolute certainty.  Executive action, including the United States Department of Homeland Security's exercise of prosecutorial discretion, can block the deportation of deportable aliens.[4]  Because Shata's trial counsel did not perform deficiently, we do not address the issue of prejudice.

### I. FACTUAL AND PROCEDURAL BACKGROUND

¶6   Shata is an Egyptian foreign national and is not a United States citizen.  He has been living in the United States since approximately 1991.  In December 2011 he opened a coffee shop called the Sphinx Café, located in Milwaukee.

¶7   On April 18, 2012, the Milwaukee County District Attorney's Office filed a criminal complaint charging Shata with one count of possession with intent to deliver marijuana, as party to a crime, contrary to Wis. Stat. §§ 961.41(1m)(h)3., 939.50(3)(g), and 939.05 (2011-12).[5]

¶8   According to the complaint, investigators obtained a warrant to search the Sphinx Café after receiving information that a substantial amount of marijuana was being stored there.  On February 16, 2012, shortly before executing the search

---

[4] "The term 'alien' means any person not a citizen or national of the United States."  8 U.S.C. § 1101(a)(3).

[5] All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.

warrant, investigators conducted surveillance of the Sphinx Café. While conducting surveillance, a detective saw Shata carry a large cardboard box from the Sphinx Café and place it in the trunk of a car parked on the street. Shata was accompanied by one of his employees, Amanda Nowak ("Nowak"). Shortly thereafter, Shata returned to the Sphinx Café and Nowak drove away in the car. Law enforcement officers subsequently conducted a traffic stop of the car. Nowak consented to a search of the car, and officers found 2,319 grams (approximately five pounds) of marijuana inside of the box that Shata had placed in the trunk. Also on February 16 investigators executed the search warrant. A search of Shata's person revealed 2.9 grams of marijuana and 1.7 grams of cocaine, which he claimed were for personal use.

¶9 The complaint further alleged that Nowak and Shata confessed to selling marijuana. Specifically, Shata confessed to selling marijuana through the Sphinx Café in order to support his family. Nowak told investigators that Shata let his marijuana supplier store marijuana at the Sphinx Café, sometimes up to 20 pounds. Nowak also told investigators that Shata sold marijuana and that he would front marijuana to her, she would sell it, and then she would give the sale proceeds to Shata.

¶10 On May 2, 2012, Shata made an initial appearance and a signature bond was set. On May 15 the circuit court held a preliminary hearing. Shata waived his right to a preliminary examination and was bound over for trial. The State then filed an information and provided a copy to Shata, who waived a

reading and pled not guilty. The information charged Shata with the same count that was in the complaint.

A. The Plea Hearing

¶11 On October 5, 2012, Shata appeared in court for a pre-trial hearing that turned into a plea hearing. Shata's attorney, James Toran ("Attorney Toran"), informed the court that Shata "doesn't want to be deported." Attorney Toran asked the court to adjourn the trial date so that he could "deal with" the immigration consequences that Shata could face if convicted. The court denied the request for an adjournment but offered to schedule another pre-trial hearing. The court passed the case to allow Attorney Toran to confer with Shata and the State.

¶12 After a discussion off the record, the parties appeared before the court again. The State described a plea agreement to the court. Specifically, if Shata pled guilty, the State would recommend two years of initial confinement followed by two years of extended supervision, imposed and stayed for 24 months of probation. As a condition of probation, the State would recommend 12 months of confinement in the House of Corrections. The maximum penalty that Shata faced was "a fine not to exceed $25,000 or imprisonment not to exceed 10 years, or both." Wis. Stat. §§ 939.50(3)(g), 961.41(1m)(h)3. Shata faced a "term of confinement in prison" not to exceed five years. Wis. Stat. § 973.01(2)(b)7.

¶13 After confirming that the State accurately described the plea agreement, Attorney Toran told the court that he had informed Shata "that there's a potential he could be deported."

MR. TORAN: And [Shata] is——I did inform him of the potential that he's——Are you a United States citizen?

THE DEFENDANT: No.

MR. TORAN: He's not a United States citizen, that there's a potential he could be deported.

THE COURT: All right. And, Mr. Shata, is that your understanding as well?

THE DEFENDANT: Yes, sir.

Shata then stated that he wished to enter a guilty plea.

¶14 The court then explained to Shata the maximum penalties he faced upon conviction and that, as a convicted felon, he would be barred from possessing a firearm and would be barred from voting in any election until his civil rights are restored. The circuit court next informed Shata of the possible immigration consequences of his plea:

THE COURT: I'll also advise you that if you're not a citizen of the United States that a plea of guilty or no contest for the offense with which you are charged may result in deportation, the exclusion from admission to this country, or the denial of naturalization under federal law. And you understand that?

THE DEFENDANT: Yes.

After the circuit court explained the elements of the offense charged, Shata pled guilty.

¶15 The circuit court then noted that Shata had signed a plea questionnaire and waiver of rights form that contained the same immigration warning.[6]

---

[6] The plea questionnaire and waiver of rights form states, inter alia, that: "I understand that if I am not a citizen of

(continued)

7

THE COURT: Sir, I have before me a document entitled a plea questionnaire, waiver of rights form, and an addendum, and there are signatures at the bottom of each. Did you sign those documents?

THE DEFENDANT: Yes, sir.

THE COURT: Did you go over the forms with your lawyer?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand everything on those forms?

THE DEFENDANT: Yes, sir.

THE COURT: Are all of your answers truthful?

THE DEFENDANT: Yes, sir.

. . .

THE COURT: Are you satisfied with your lawyer's representation?

THE DEFENDANT: Yes, sir.

¶16 The court then confirmed with Attorney Toran that he discussed the plea questionnaire with Shata.

THE COURT: Mr. Toran, have you gone over the plea questionnaire, waiver of rights forms with your client?

MR. TORAN: Yes, I have.

THE COURT: Satisfied he understands all the rights he'll be giving up by entering his plea?

---

the United States, my plea could result in deportation, the exclusion of admission to this country, or the denial of naturalization under federal law." Shata and Attorney Toran signed the form on October 5, 2012, the date of the plea and sentencing hearing.

MR. TORAN: Yes, Your Honor.

THE COURT: Satisfied the plea is being made freely, voluntarily, and intelligently?

MR. TORAN: Yes.

¶17 The court then accepted the guilty plea, "find[ing] that the defendant is entering his plea freely, voluntarily, and intelligently, with full understanding of the nature of the offense charged, the maximum possible penalties, and all the rights he'll be giving up by entering his plea of guilty . . . ." The court subsequently found Shata guilty and entered a judgment of conviction. At the end of the plea hearing, the court decided not to order a presentence investigation and scheduled a sentencing hearing.[7]

## B. The Sentencing Hearing

¶18 On November 16, 2012, the circuit court held a sentencing hearing. The State argued that Shata deserved one year of conditional jail time as a condition of probation because of his "lack of a prior [criminal] record," his "character," and the facts of the case. The State argued that Shata "manipulate[ed] and use[d]" his co-defendant, Amanda Nowak, who was 17 years of age at the time. The State argued that "it's . . . disgusting that [Shata] would use his influence as a boss and [Nowak's] age and get her wrapped up into this." The State also noted the danger of violence associated with

---

[7] The circuit court wanted to schedule the sentencing hearing for October 31, 2012, but due to Attorney Toran's schedule, the court set the hearing for November 16.

sales of illegal drugs. However, because Shata did "appear to be remorseful" and had no prior criminal record, the State felt that "probation is appropriate."

¶19 At the sentencing hearing, Attorney Toran recommended that the court "impose and stay a prison sentence, place [Shata] on probation, and . . . allow his probation to be transferred to the State of New Jersey and . . . impose condition time but stay that as well." Attorney Toran noted that Shata had recently moved with his wife and children to New Jersey and that he returned from there to Milwaukee for every court appearance, demonstrating Shata's good character. Attorney Toran also noted that he tried to arrange for a deferred prosecution, "but the State was not amenable to doing so, and [Shata is] very, very concerned about being deported out of this country." Attorney Toran argued that his recommended sentence was appropriate because Shata has a college degree, is an entrepreneur, has a supportive family, and is "kind of a patsy kind of guy" and "is not a major player." Attorney Toran also noted that Shata had potential employment opportunities in New Jersey, was financially destitute, and had lost over $300,000 in the restaurant business.

¶20 The court noted that its sentence would be based on the arguments of counsel as well as society's interest in punishment, deterrence, and rehabilitation. The court stated that Shata's offense is "serious" and that illegal drugs are "destroying the lives of individuals" and have a "big impact throughout the community." The court also stated that Shata was

10

"taking advantage of other people." The court noted that although Shata had no prior criminal record and had a supportive family, "the community needs to be protected from someone who's dealing this quantity of drugs." The court then sentenced Shata to five years of imprisonment consisting of one year of initial confinement in prison and four years of extended supervision. The court allowed the extended supervision to be transferred to New Jersey. Although the court did not follow either party's recommendation, it did impose one year of confinement, as the State recommended pursuant to the plea agreement.

C. Shata's Plea Withdrawal Motion and Hearing

¶21 About four months later, on March 15, 2013, Shata filed a postconviction motion to withdraw his guilty plea. In his motion, he argued that he received ineffective assistance of counsel because Attorney Toran failed to inform him "that federal law required he be deported following his conviction." Shata argued that Attorney Toran should have told him "that he was subject to mandatory deportation because the offense involved more than 30 grams of marijuana." Shata alleged that Attorney Toran "informed him that he did not have to worry about any immigration consequences because he would be receiving probation, and [Immigration and Customs Enforcement] only initiated deportation proceedings for aliens serving prison terms." However, despite that allegation, Shata noted that Attorney Toran stated at the plea hearing that "'there's a potential he could be deported.'" Shata also complained that the circuit court "did not inform [him] that his conviction

11

would necessarily subject him to deportation proceedings. The court merely stated that his plea 'may' result in deportation."

¶22 On May 31, 2013, the circuit court held a <u>Machner</u> hearing on Shata's postconviction motion.[8] Attorney Toran testified that he had informed Shata of the potential for deportation if convicted. Attorney Toran testified that he had used the word "potential" and did not tell Shata that deportation was "mandatory." He also testified that he "advised [Shata] prior to the plea that he may be deported, that there's a strong chance that he could be deported . . . ." Attorney Toran testified that he "knew [pleading guilty] would subject [Shata] to deportation." But Attorney Toran "didn't know [deportation] was mandatory." Attorney Toran testified that he "didn't research the immigration consequences in terms of whether or not it was mandatory." He also stated that he had not researched the federal immigration statutes. However, he explained that he was familiar with <u>Padilla</u>, 559 U.S. 356. He also testified that he had "asked a number of federal prosecutors about whether or not the impact of pleading to this charge would subject [Shata] to deportation, and they said it could, everyone used the word 'it could.'" Attorney Toran also explained that he had tried to have the charge amended so that Shata could avoid the possibility of deportation, but the State was unwilling to amend the charge. Attorney Toran testified

---

[8] <u>See</u> <u>State v. Machner</u>, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

12

that he had advised Shata to plead guilty because they had "no defense," Shata confessed to the crime, and the State would recommend probation if he pled guilty.

¶23 Shata testified next. He stated that he would not have pled guilty if he had known that he would be subject to mandatory deportation upon conviction. He testified that Attorney Toran "didn't say a strong chance" of deportation existed. To the contrary, Shata testified that Attorney Toran "promised [him] to get probation" and told Shata that "if you get probation, you're not going to be deported." Shata further testified that he received a letter from the Immigration and Naturalization Services that ordered him to appear before an immigration judge.[9]

¶24 The circuit court found that the testimony of Attorney Toran was more credible and that counsel had informed Shata of a strong likelihood of deportation if convicted. It found "the testimony of Mr. Toran to be credible under the circumstances,

---

[9] This letter does not appear in the record. Further, the United States Immigration and Naturalization Services ceased to exist in 2003. The record, however, does contain "Page 1 of 3" of a U.S. Department of Homeland Security ("DHS") "Immigration Detainer——Notice of Action," which was signed on November 23, 2012. A checked box on the form indicates that the DHS "[i]nitiated an investigation to determine whether this person is subject to removal from the United States." An unchecked box on the form indicates that the DHS had not "[i]nitiated removal proceedings and served a Notice to Appear or other charging document." Another unchecked box on the form indicates that the DHS had not "[o]btained an order of deportation or removal from the United States for this person."

that he did advise Mr. Shata, unlike Padilla, that there was a strong likelihood that he would be deported." The circuit court also stated, "I don't find that Mr. Toran told Mr. Shata that he would be getting probation and would go back to New Jersey and nothing would happen."

¶25 The circuit court concluded that Shata had not received ineffective assistance of counsel. The court held that Attorney Toran did not perform deficiently. The circuit court distinguished Padilla explaining that "even the language in Padilla is not that it's mandatory that you'll be deported, but that it's presumptively mandatory, and the difference between the strong likelihood and presumptive deportation, I don't think that there's necessarily a significant difference." The circuit court also held that Shata failed to prove that he was prejudiced. It stated, "I don't find Mr. Shata's testimony to be credible today that he would've gone to trial under any circumstance had he known that removal, deportation was a presumptive mandatory." The court also noted that "[t]here appears to be some discretion" as to whether Shata will be deported and that "[i]t appears at least no one has presented factually that the law is that he will, in fact, automatically be deported." Accordingly, the circuit court denied Shata's motion to withdraw his guilty plea and issued a written order to that effect on July 15, 2013.

D. The Court of Appeals' Decision

¶26 On July 15, 2014, the court of appeals, in a split decision, reversed the circuit court's judgment of conviction

14

and order denying postconviction relief. The majority concluded that Shata received ineffective assistance of counsel. First, the majority held that Attorney Toran, by informing Shata that he faced a strong likelihood of deportation if convicted, "was deficient when he failed to provide Shata with complete and accurate information about the deportation consequences of his plea." State v. Shata, No. 2013AP1437-CR, unpublished slip op., ¶28 (Wis. Ct. App. July 15, 2014). The majority reasoned that "the deportation consequences for conviction of Shata's offense, like the consequences of Padilla's, were in fact dramatically more serious than 'a strong likelihood.'" Id. The majority also held that this deficiency prejudiced Shata. Id., ¶¶29-33.

¶27 Judge Brennan dissented. She reasoned that "[t]rial counsel not only complied with Padilla's requirement that he inform Shata 'whether his plea carries a risk of deportation,' see [Padilla], 559 U.S. at 374, trial counsel went one better and advised Shata not only that there was a 'risk' of deportation, but that there was a strong one." Id., ¶38 (Brennan, J., dissenting). Judge Brennan also concluded that Shata suffered no prejudice because he "fail[ed] to show that it would have been a rational decision for him to reject a plea with a probation recommendation." Id., ¶49 (Brennan, J., dissenting).

¶28 On August 14, 2014, the State filed a petition for review, which we granted on December 18, 2014.

II. STANDARD FOR PLEA WITHDRAWAL AND STANDARD OF REVIEW

15

¶29 "In general 'a circuit court should freely allow a defendant to withdraw his plea prior to sentencing for any fair and just reason, unless the prosecution [would] be substantially prejudiced.'" State v. Lopez, 2014 WI 11, ¶2, 353 Wis. 2d 1, 843 N.W.2d 390 (emphasis added) (quoting State v. Jenkins, 2007 WI 96, ¶2, 303 Wis. 2d 157, 736 N.W.2d 24) (internal quotation marks omitted). In contrast, "the general rule [is] that a defendant seeking to withdraw a guilty or no contest plea after sentencing must prove manifest injustice by clear and convincing evidence." State v. Negrete, 2012 WI 92, ¶29, 343 Wis. 2d 1, 819 N.W.2d 749 (emphasis added) (citations omitted). Ineffective assistance of counsel is one type of manifest injustice. See State v. Taylor, 2013 WI 34, ¶49, 347 Wis. 2d 30, 829 N.W.2d 482.

¶30 "The clear and convincing standard for plea withdrawal after sentencing, which is higher than the 'fair and just' standard before sentencing, 'reflects the State's interest in the finality of convictions, and reflects the fact that the presumption of innocence no longer exists.'" Id., ¶48 (quoting State v. Cross, 2010 WI 70, ¶42, 326 Wis. 2d 492, 786 N.W.2d 64). "The higher burden 'is a deterrent to defendants testing the waters for possible punishments.'" Id. (quoting State v. Nawrocke, 193 Wis. 2d 373, 379-80, 534 N.W.2d 624 (Ct. App. 1995)). "Disappointment in the eventual punishment does not rise to the level of a manifest injustice." Id., ¶49 (citing Nawrocke, 193 Wis. 2d at 379).

16

¶31 "A claim of ineffective assistance of counsel is a mixed question of fact and law." State v. Carter, 2010 WI 40, ¶19, 324 Wis. 2d 640, 782 N.W.2d 695 (citations omitted). "We will uphold the circuit court's findings of fact unless they are clearly erroneous." Id. (citation omitted). "Findings of fact include 'the circumstances of the case and the counsel's conduct and strategy.'" Id. (quoting State v. Thiel, 2003 WI 111, ¶21, 264 Wis. 2d 571, 665 N.W.2d 305) (quotation marks omitted). "Moreover, this court will not exclude the circuit court's articulated assessments of credibility and demeanor, unless they are clearly erroneous." Id. (citing Thiel, 264 Wis. 2d 57, ¶23). "However, the ultimate determination of whether counsel's assistance was ineffective is a question of law, which we review de novo." Id.

### III. ANALYSIS

¶32 "Both the United States Constitution and the Wisconsin Constitution guarantee criminal defendants the right to counsel." Carter, 324 Wis. 2d 640, ¶20 (citing U.S. Const. amend. VI; Wis. Const. art. I, § 7). "The United States Supreme Court has recognized that 'the right to counsel is the right to the effective assistance of counsel.'" Id. (quoting Strickland v. Washington, 466 U.S. 668, 686 (1984)) (quotation marks omitted).

¶33 "Whether a convicted defendant received ineffective assistance of counsel is a two-part inquiry." Id., ¶21 (citing Strickland, 466 U.S. at 687). "First, the defendant must prove that counsel's performance was deficient." Id. (citing

17

*Strickland*, 466 U.S. at 687). "Second, if counsel's performance was deficient, the defendant must prove that the deficiency prejudiced the defense." *Id.* (citing *Strickland*, 466 U.S. at 687). To succeed on a claim of ineffective assistance of counsel, a defendant must prove both deficient performance and prejudice. *Id.* (citing *Strickland*, 466 U.S. at 687). If a defendant fails to prove deficient performance, a reviewing court need not consider whether the defendant was prejudiced. *Id.*, ¶36; *State v. Franklin*, 2001 WI 104, ¶13, 245 Wis. 2d 582, 629 N.W.2d 289 (citing *Strickland*, 466 U.S. at 697).[10]

¶34 Prior to *Padilla* state courts and federal courts of appeals almost universally held that defense counsel's failure to advise a criminal defendant of possible immigration consequences of a conviction does not provide a basis for an ineffective assistance claim. *Padilla*, 559 U.S. at 364-65 & n.9; *Chaidez v. United States*, 568 U.S. ___, 133 S. Ct. 1103, 1109 & nn.8-9 (2013). These courts reasoned that "collateral

---

[10] A defendant must make a sufficient proffer in order to be entitled to a hearing on an ineffective assistance of counsel claim. "[T]he circuit court has the discretion to deny the postconviction motion without a *Machner* hearing 'if the motion fails to allege sufficient facts to raise a question of fact, presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief.'" *State v. Roberson*, 2006 WI 80, ¶43, 292 Wis. 2d 280, 717 N.W.2d 111 (emphasis added in *Roberson*) (quoting *State v. Curtis*, 218 Wis. 2d 550, 555 n.3, 582 N.W.2d 409 (Ct. App. 1998)). A defendant is not "automatically entitled to an evidentiary hearing no matter how cursory or meritless the ineffective assistance of counsel claim might be." *Curtis*, 218 Wis. 2d at 555 n.3.

18

matters, i.e., those matters not within the sentencing authority of the state trial court," are outside the scope of counsel's duties under the Sixth Amendment. Padilla, 559 U.S. at 364-65 & n.9.

¶35 The Supreme Court in Padilla parted ways with that precedent by holding "that counsel must inform her client whether his plea carries a risk of deportation."[11] Id. at 374. The Court explained:

> When the law is not succinct and straightforward . . . , a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences. But when the deportation consequence is truly clear, . . . the duty to give correct advice is equally clear.

Id. at 369 (footnote omitted).

¶36 In the present case, Shata and the State agree that his conviction clearly made him deportable. The issue of whether Shata's trial counsel performed deficiently hinges on whether he gave Shata correct advice regarding the possibility of being deported. We will first provide background on Padilla

---

[11] The Supreme Court noted that it has

> never applied a distinction between direct and collateral consequences to define the scope of constitutionally "reasonable professional assistance" required under Strickland[ v. Washington, 466 U.S. 668, 689 (1984)]. Whether that distinction is appropriate is a question we need not consider in this case because of the unique nature of deportation.

Padilla, 559 U.S. at 365.

19

and relevant immigration law. Second, we will summarize the parties' arguments. Third and finally, we will determine whether Shata's trial counsel performed deficiently under Padilla. Because we conclude that Shata failed to prove deficient performance, we do not address prejudice.

A. Padilla and Background Immigration Law

¶37 "The landscape of federal immigration law has changed dramatically over the last 90 years." Padilla, 559 U.S. at 360. "While once there was only a narrow class of deportable offenses and judges wielded broad discretionary authority to prevent deportation, immigration reforms over time have expanded the class of deportable offenses and limited the authority of judges to alleviate the harsh consequences of deportation." Id.

¶38 By passing the Immigration Act of 1917, "[f]or the first time in our [nation's] history, Congress made classes of noncitizens deportable based on conduct committed on American soil." Id. at 361 (citation omitted). Although the Act "authorized deportation as a consequence of certain convictions," it included a procedure, known as a judicial recommendation against deportation ("JRAD"), which allowed a sentencing judge in a state or federal prosecution to make a recommendation that a noncitizen defendant not be deported. Id. A JRAD forbade deportation and was binding on the executive branch. Id. at 361-62. "Thus, from 1917 forward, there was no such creature as an automatically deportable offense. Even as the class of deportable offenses expanded, judges retained discretion to ameliorate unjust results on a case-by-case

20

basis." Id. at 362. "Although narcotics offenses . . . provided a distinct basis for deportation as early as 1922, the JRAD procedure was generally available to avoid deportation in narcotics convictions." Id. (footnote omitted) (citation omitted).

¶39 "However, the JRAD procedure is no longer part of our law. Congress first circumscribed the JRAD provision in the 1952 Immigration and Nationality Act (INA), and in 1990 Congress entirely eliminated it[.]" Id. at 363 (footnote omitted) (citation omitted). "In 1996, Congress also eliminated the Attorney General's authority to grant discretionary relief from deportation[.]" Id. (citation omitted).

> Under contemporary law, if a noncitizen has committed a removable offense after the 1996 effective date of these amendments, his removal is practically inevitable but for the possible exercise of limited remnants of equitable discretion vested in the Attorney General to cancel removal for noncitizens convicted of particular classes of offenses.

Id. at 363-64 (citing 8 U.S.C. § 1229b). "Subject to limited exceptions, this discretionary relief is not available for an offense related to trafficking in a controlled substance." Id. at 364 (citing 8 U.S.C. §§ 1101(a)(43)(B), 1228).

¶40 The Supreme Court in Padilla stated that "[t]hese changes to our immigration law have dramatically raised the stakes of a noncitizen's criminal conviction. The importance of accurate legal advice for noncitizens accused of crimes has never been more important." Id. at 364. Accordingly, the Court "conclude[d] that advice regarding deportation is not

21

categorically removed from the ambit of the Sixth Amendment right to counsel." Id. at 366.

¶41 Before determining the scope of an attorney's duty to give advice regarding deportation, the Court explained that the deficient-performance prong of Strickland "is necessarily linked to the practice and expectations of the legal community: 'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" Id. at 366 (quoting Strickland, 466 U.S. at 688). The Court noted that "[t]he weight of prevailing professional norms supports the view that counsel must advise her client regarding the risk of deportation." Id. at 367-68 (collecting authorities).

¶42 The Court also noted that "[i]mmigration law can be complex, and it is a legal specialty of its own. Some members of the bar who represent clients facing criminal charges, in either state or federal court or both, may not be well versed in it." Id. at 369. "There will, therefore, undoubtedly be numerous situations in which the deportation consequences of a particular plea are unclear or uncertain. The duty of the private practitioner in such cases is more limited." Id.

¶43 The Court then explained the scope of an attorney's duty to give advice regarding deportation. "When the law is not succinct and straightforward . . . , a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences." Id. "But when the deportation consequence is truly clear, as it was in this case, the duty to give correct

22

advice is equally clear." Id. Ultimately, the Court "[held] that counsel must inform her client whether his plea carries a risk of deportation." Id. at 374.

¶44 In Padilla Jose Padilla, a native of Honduras who had been a lawful permanent resident of the United States for more than 40 years, pled guilty to transporting a large amount of marijuana in his tractor-trailer in Kentucky. Id. at 359. His offense made him "deportable" from the United States. Id. at 359 & n.1. Padilla filed a postconviction motion to withdraw his guilty plea, arguing that he received ineffective assistance of counsel.[12] Id. at 359. He claimed that his trial counsel told him that he would not be deported because he had lived in the United States for such a long time. Id.

¶45 The Supreme Court determined that "[t]his is not a hard case in which to find deficiency: The consequences of Padilla's plea could easily be determined from reading the removal statute, his deportation was presumptively mandatory, and his counsel's advice was incorrect." Id. at 368-69. The Court reasoned that "the terms of the relevant immigration statute are succinct, clear, and explicit in defining the removal consequence for Padilla's conviction." Id. at 368 (citing 8 U.S.C. § 1227(a)(2)(B)(i)).

¶46 The relevant federal statute provided:

---

[12] It appears that Padilla moved to withdraw his plea post-sentencing. See Com. v. Padilla, 253 S.W.3d 482, 483 (Ky. 2008), rev'd and remanded sub nom, Padilla v. Kentucky, 559 U.S. 356 (2010).

23

Any alien who at any time after admission has been convicted of a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of title 21), other than a single offense involving possession for one's own use of 30 grams or less of marijuana, is <u>deportable</u>.

8 U.S.C. § 1227(a)(2)(B)(i) (emphasis added). "Any alien . . . in and admitted to the United States shall, upon the order of the Attorney General, be removed if the alien is" convicted of such an offense. 8 U.S.C. § 1227(a) (intro.).

¶47 The Court explained that "Padilla's counsel could have easily determined that his plea would make him eligible for deportation simply from reading the text of the statute, which addresses not some broad classification of crimes but specifically commands removal for all controlled substances convictions except for the most trivial of marijuana possession offenses." Padilla, 559 U.S. at 368. "Instead, Padilla's counsel provided him false assurance that his conviction would not result in his removal from this country." Id.

B. The Parties' Arguments

¶48 The State argues that Shata's trial counsel, Attorney Toran, did not perform deficiently. The State contends that Shata's deportation is not inevitable. The State contends that, because the relevant immigration statute made Shata "deportable" upon conviction, Padilla required Attorney Toran to inform Shata "whether his plea carries a risk of deportation." Padilla, 559 U.S. at 374. The State argues that Attorney Toran complied with and, in fact, exceeded the requirements of Padilla by telling

24

Shata that his conviction carried a "strong chance" of deportation.  The State contrasts that advice with the false assurance that Padilla received from his attorney that he would not be deported.  The State relies on several cases in which courts held that Padilla requires counsel to inform a defendant that a conviction for a deportable offense carries a risk of deportation.  See Com. v. Escobar, 70 A.3d 838 (Pa. Super. Ct. 2013); Chacon v. State, 409 S.W.3d 529 (Mo. Ct. App. 2013); Neufville v. State, 13 A.3d 607 (R.I. 2011).[13]

¶49 For example, in Escobar the Pennsylvania Superior Court held that Padilla requires counsel to inform an alien criminal defendant that a drug-related conviction carries a "risk" of deportation.  In that case, Israel Escobar pled guilty to possession with intent to deliver cocaine and was sentenced. Escobar, 70 A.3d at 840.  After the federal government began deportation proceedings against him, he sought to withdraw his plea on the basis of ineffective assistance of counsel.  Id.  He argued that his attorney performed deficiently by failing to advise him that "deportation would, in fact, result from his plea, and not just that deportation was likely to result."  Id.

¶50 The Pennsylvania Superior Court held that Escobar's trial counsel did not perform deficiently by advising him that his guilty plea would "likely" result in deportation.  Id. at 842.  The court noted that the Supreme Court in Padilla held

---

[13] In each of these cases, the defendant moved post-sentencing to withdraw his plea.

25

that "when the deportation consequence is truly clear, 'the duty to give <u>correct advice</u> is equally clear.'" <u>Id.</u> at 841 (emphasis added in <u>Escobar</u>) (quoting <u>Padilla</u>, 559 U.S. at 369). The court rejected the notion "that giving 'correct' advice necessarily means counsel, when advising Escobar about his deportation risk, needed to tell Escobar he definitely would be deported." <u>Id.</u> Although 8 U.S.C. § 1227(a)(2)(B)(i) made Escobar "deportable" upon conviction, "whether the U.S. Attorney General and/or other personnel would necessarily take all the steps needed to institute and carry out Escobar's actual deportation was not an absolute certainty when he pled." <u>Id.</u> "Given that Escobar did know deportation was possible, given that counsel advised him there was a substantial risk of deportation, and given that counsel told Escobar it was likely there would be deportation proceedings instituted against him, we find counsel's advice was, in fact, correct." <u>Id.</u> Although the <u>Padilla</u> Court stated that 8 U.S.C. § 1227(a)(2)(B) made Padilla "eligible for deportation" and that "his deportation was presumptively mandatory," the Supreme Court and that statute did not announce "a guarantee that actual deportation proceedings are a certainty such that counsel must advise a defendant to that effect." <u>Id.</u> at 842.

¶51 The <u>Escobar</u> court "acknowledge[d] that parts of the <u>Padilla</u> opinion contain language arguably supporting the notion that plea counsel in some cases may have a duty to provide a rather certain indication of deportation." <u>Id.</u> "For example, at one point, the <u>Padilla</u> court agreed competent counsel would

26

have told Padilla he was 'subject to automatic deportation.'" Id. (quoting Padilla, 559 U.S. at 360). "At another point, the [Padilla] court indicated the instant deportation statute 'commands' deportation for virtually all drug convictions." Id. (quoting Padilla, 559 U.S. at 368). "The opinion likewise observes that deportation for certain convictions is 'practically inevitable.'" Id. (quoting Padilla, 559 U.S. at 363-64).

¶52 Nevertheless, the Escobar court concluded that

the [Padilla] court's overall emphasis was that the deportation statute in question makes most drug convicts subject to deportation in the sense that they certainly become deportable, not in the sense that plea counsel should know and state with certainty that the federal government will, in fact, initiate deportation proceedings.

Id. The court reasoned that, "[u]ltimately, when announcing its holding, the Padilla court opined, '[W]e now hold that counsel must inform [the] client whether [the] plea carries a risk of deportation.'" Id. (quoting Padilla, 559 U.S. at 374). The court held that Escobar's trial attorney complied with Padilla by informing him that "his plea carried a risk of deportation." Id. "In fact, counsel told Escobar deportation proceedings were likely." Id.

¶53 On the other hand, Shata argues that Attorney Toran performed deficiently. Shata argues that Attorney Toran was required, under Padilla, to tell him that "his conviction would absolutely result in deportation." Shata contends that "[t]here is no difference between Padilla's attorney, who affirmatively

27

gave her client bad advice, and Shata's attorney, who told him there was a 'strong chance' he would be deported when it was actually inevitable." According to Shata, Attorney Toran gave him "misinformation" because "[t]here is a difference between a 'strong chance' and an 'absolute certainty.'" He notes that the Supreme Court in Padilla stated that "constitutionally competent counsel would have advised [Padilla] that his conviction for drug distribution made him subject to automatic deportation." Padilla, 559 U.S. at 360. He also relies on several cases in which courts interpreted Padilla as requiring counsel to inform an alien defendant that a conviction for a deportable offense would necessarily result in deportation. See State v. Mendez, 2014 WI App 57, 354 Wis. 2d 88, 847 N.W.2d 895; see also United States v. Bonilla, 637 F.3d 980 (9th Cir. 2011); Salazar v. State, 361 S.W.3d 99 (Tex. App. 2011); State v. Sandoval, 249 P.3d 1015 (Wash. 2011) (en banc).

¶54 For example, in Mendez, Ivan Mendez moved to withdraw his guilty plea to maintaining a drug trafficking place.[14] Mendez, 354 Wis. 2d 88, ¶1. In support of his motion he argued that he received ineffective assistance of counsel because his "attorney failed to inform him that conviction of this charge would subject him to automatic deportation from the United States with no applicable exception and no possibility of

---

[14] The court of appeals' opinion did not state whether Mendez moved to withdraw his guilty plea before or after being sentenced.

discretionary waiver." Id. (citations omitted). Mendez's trial attorney "'basically' reiterated the general warning on the plea questionnaire, that 'a conviction may make [the defendant] inadmissible or deportable.'" Id., ¶4 (alteration in original). The Wisconsin Court of Appeals held that this advice constituted deficient performance. Id., ¶¶9-10.

¶55 The court of appeals in Mendez rejected Chacon, on which the State relies in the present case. Id., ¶¶13-14. In Chacon the Missouri Court of Appeals held that the defendant's attorney did not perform deficiently by advising him that upon being convicted for two deportable offenses "he 'would very likely be deported and wouldn't be able to come back.'" Id., ¶13 (quoting Chacon, 409 S.W.3d at 536). In Mendez the court of appeals stated, "We reject Chacon. Its holding is contrary to Padilla's plain statement that 'when the deportation consequence is truly clear . . . the duty to give correct advice is equally clear.'" Id., ¶14 (quoting Padilla, 559 U.S. at 369). "In addition to being bad law, Chacon is distinguishable from Mendez's case, because while Chacon's lawyer at least told Chacon that deportation was 'very likely,' Mendez's lawyer gave only the same unclear warning that appears in the generic plea questionnaire, that the plea 'could result in deportation.'" Id., ¶14.

C. Whether Shata's Trial Counsel Performed Deficiently

¶56 "To demonstrate deficient performance, the defendant must show that his counsel's representation 'fell below an objective standard of reasonableness' considering all the

29

circumstances." Carter, 324 Wis. 2d 640, ¶22 (quoting Strickland, 466 U.S. at 688). "In evaluating the reasonableness of counsel's performance, this court must be 'highly deferential.'" Id. (quoting Strickland, 466 U.S. at 689). "Counsel enjoys a 'strong presumption' that his conduct 'falls within the wide range of reasonable professional assistance.'" Id. (quoting Strickland, 466 U.S. at 689). "Indeed, counsel's performance need not be perfect, nor even very good, to be constitutionally adequate." Id. (citing Thiel, 264 Wis. 2d 571, ¶19). Because we determine that Shata's trial counsel did not perform deficiently, we do not address prejudice.

¶57 The Supreme Court in Padilla stated that "when the deportation consequence is truly clear, . . . the duty to give correct advice is equally clear." Padilla, 559 U.S. at 369 (emphasis added). Shata and the State agree that his conviction clearly made him deportable. The parties disagree, however, as to whether Shata's trial counsel gave correct advice.

¶58 At the outset, we note that the advice that Shata received is far better than the advice that Padilla received. "Padilla's counsel provided him false assurance that his conviction would not result in his removal from this country." Id. at 368 (emphasis added). Thus, the Supreme Court determined that "[t]his is not a hard case in which to find deficiency: The consequences of Padilla's plea could easily be determined from reading the removal statute, his deportation was presumptively mandatory, and his counsel's advice was incorrect." Id. at 368-

30

69 (emphasis added). In contrast, Shata received <u>correct</u> immigration advice. Shata's trial counsel, Attorney Toran, correctly told Shata that his conviction carried a "strong chance" of deportation.[15] Accordingly, we disagree with Shata's contention that the advice he received is "no differen[t]" than the incorrect legal advice that Padilla received.

¶59 Although a controlled substance conviction makes an alien "deportable," 8 U.S.C. § 1227(a)(2)(B)(i), such a conviction will not necessarily result in deportation. The Pennsylvania Superior Court in <u>Escobar</u> correctly noted that whether immigration "personnel would necessarily take all the steps needed to institute and carry out [an alien's] actual deportation [i]s not an absolute certainty . . . ." <u>Escobar</u>, 70 A.3d at 841. For example, prosecutorial discretion and the current administration's immigration policies provide possible avenues for deportable aliens to avoid deportation.[16] In fact,

---

[15] Shata appears to have dropped his assertion that Attorney Toran never told him that his guilty plea carried a strong chance of deportation. In any event, the circuit court found that Attorney Toran told Shata that his guilty plea carried a "strong likelihood" of deportation, and that finding is not clearly erroneous.

[16] Since at least the 1960s, the federal executive branch has gone back and forth in adopting and rescinding policies regarding deferred action on deportation. See <u>Texas v. United States</u>, No. CIV. B-14-254, 2015 WL 648579, at *7 & n.12 (S.D. Tex. Feb. 16, 2015). On June 15, 2012, the United States Department of Homeland Security ("DHS") adopted the Deferred Action for Childhood Arrivals ("DACA") program, which provided relief from deportation for certain aliens who entered the United States before age 16. <u>Id.</u> at *4. On June 5, 2014, the United States Citizenship and Immigration Services, which is a
(continued)

31

the executive branch has essentially unreviewable prosecutorial discretion with respect to commencing deportation proceedings, adjudicating cases, and executing removal orders. Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 482-85 (1999).

¶60 Indeed, the secretary of the United States Department of Homeland Security ("DHS") recently explained that the DHS, which is "responsible for enforcing the nation's immigration laws," "must exercise prosecutorial discretion in the enforcement of the law." Jeh Charles Johnson, Policies for the Apprehension, Detention and Removal of Undocumented Immigrants, at 2 (Nov. 20, 2014) (emphasis added), available at http://www.dhs.gov/sites/default/files/publications/14_1120_memo _prosecutorial_discretion.pdf. "Due to limited resources, DHS . . . cannot respond to all immigration violations or remove all persons illegally in the United States." Id. "DHS may exercise prosecutorial discretion at any stage of an enforcement proceeding." Id. "In the immigration context, prosecutorial discretion should apply not only to the decision to issue, serve, file, or cancel a Notice to Appear,[17] but also to a broad

component of DHS, expanded the DACA program to provide relief to more aliens. Id. at *5-6. On November 20, 2014, DHS adopted the Deferred Action for Parents of Americans ("DAPA") program, which provided relief from deportation for certain undocumented aliens who have a child who is a United States citizen or lawful permanent resident. Id. at *6-7. In February 2015 the United States District Court for the Southern District of Texas issued a preliminary injunction prohibiting the implementation of the 2014 DACA expansion and the DAPA program. Id. at *62. The court did not enjoin the original 2012 DACA program. Id.

[17] A "notice to appear" initiates a removal proceeding. 8
(continued)

32

range of other discretionary enforcement decisions, including deciding" "whether to settle [or] dismiss . . . a case" and "whether to grant deferred action . . . or a stay of removal . . . ."  Id.  Deportation is not mandatory for a felony conviction.  Rather, certain aliens, including those convicted of a felony, are generally "prioritized for removal" unless, "based on the totality of the circumstances," the alien "should not . . . be an enforcement priority."  Id. at 5-6.  Relevant factors include an alien's "length of time in the United States" and "family or community ties in the United States."  Id. at 6.  Because deportation is not an absolutely certain consequence of a conviction for a deportable offense, Padilla does not require an attorney to advise an alien client that deportation is an absolute certainty upon conviction of a deportable offense, including a controlled substance offense.  Escobar, 70 A.3d at 841-42.

¶61 In fact, the Padilla Court never stated that Padilla would absolutely be deported.  The Padilla Court stated that "the terms of the relevant immigration statute are succinct, clear, and explicit in defining the removal consequence for Padilla's conviction."  Padilla 559 U.S. at 368 (citing 8 U.S.C. § 1227(a)(2)(B)(i)).  The clear removal consequence was that Padilla was "eligible for deportation."  Id.  Two sentences later, the Court stated that Padilla's deportation was

U.S.C. § 1229(a).

33

"presumptively mandatory." Id. at 369. Thus, the Court meant that Padilla clearly was deportable under that immigration statute, not that he clearly would be deported. Escobar, 70 A.3d at 842. Shata emphasizes that the Padilla Court stated, "[w]e agree with Padilla that constitutionally competent counsel would have advised him that his conviction for drug distribution made him subject to automatic deportation." Padilla, 559 U.S. at 360. However, by "subject to automatic deportation," the Court meant that Padilla was automatically deportable upon conviction, not that he would be automatically deported. As the Court explained later, a conviction for drug trafficking automatically makes an alien deportable because the Attorney General has "limited" discretion to cancel removal of an alien with such a conviction. See id. at 363-64 (explaining that "removal is practically inevitable" if "a noncitizen has committed a removable offense" because the Attorney General has "limited" discretion to cancel removal of such an alien). The Padilla Court did not require that counsel advise that the DHS would necessarily initiate and prosecute a removal proceeding against Padilla and enforce a removal order against him because that was far from certain. Rather, the Court's "overall emphasis was that the deportation statute in question makes most drug convicts subject to deportation in the sense that they certainly become deportable, not in the sense that plea counsel should know and state with certainty that the federal government will, in fact, initiate deportation proceedings." Escobar, 70 A.3d at 842.

34

¶62 Likewise, the Supreme Court's ultimate holding in Padilla recognized that Padilla's deportation was not an absolute certainty. The Padilla Court ultimately "[held] that counsel must inform her client whether his plea carries a risk of deportation." Padilla, 559 U.S. at 374 (emphasis added). The Court did not hold that an attorney must inform an alien client that a conviction for a deportable offense will absolutely result in deportation. The Court did not require an attorney to use any particular words, such as "inevitable deportation," or to even convey the idea of inevitable deportation. See Chacon, 409 S.W.3d at 537 ("Padilla does not require that counsel use specific words to communicate to a defendant the consequences of entering a guilty plea. Rather, it requires that counsel correctly advise his client of the risk of deportation so that the plea is knowing and voluntary.").

¶63 The Padilla Court did not require that criminal defense lawyers function as immigration lawyers or be able to predict what the executive branch's immigration policies might be now or in the future. Immediately before announcing the scope of a criminal defense attorney's duty to provide advice regarding deportation, the Court noted that "[i]mmigration law can be complex, and it is a legal specialty of its own. Some members of the bar who represent clients facing criminal charges, in either state or federal court or both, may not be well versed in it." Id. at 369. Accordingly, "the Court appears to acknowledge [that] thorough understanding of the intricacies of immigration law is not 'within the range of

35

competence demanded of attorneys in criminal cases.'" Id. at 385 (Alito, J., concurring) (quoting Strickland, 466 U.S. at 687). "[R]easonably competent attorneys should know that it is not appropriate or responsible to hold themselves out as authorities on a difficult and complicated subject matter with which they are not familiar," such as immigration law. Id. (Alito, J., concurring).

¶64 Instead of requiring criminal defense attorneys to essentially serve as immigration lawyers for their alien clients, Padilla continued the longstanding practice of Strickland by requiring counsel to act "'reasonabl[y] under prevailing professional norms.'" Id. at 366 (majority opinion) (quoting Strickland, 466 U.S. at 688) ("'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'"). The Court further explained that "[t]he weight of prevailing professional norms supports the view that counsel must advise her client regarding the risk of deportation." Id. at 367 (emphasis added) (collecting authorities). The Court did not conclude that prevailing professional norms require attorneys to inform alien clients that convictions for deportable offenses will absolutely result in deportation. See id.

¶65 The Padilla Court suggested that an attorney would give reasonably competent advice by providing a warning similar to the one that Wis. Stat. § 971.08 requires a circuit court to give: that an alien's conviction may result in deportation. The Padilla Court noted that "many States require trial courts to

36

advise defendants of possible immigration consequences." Id. at 374 n.15. The Court cited to Wis. Stat. § 971.08 (2005-06), among similar statutes from other States. Id. The Court explained that these statutes were "significant" to its conclusion that an attorney must "inform her noncitizen client that he faces a risk of deportation." Id. at 373-74 & n.15 (emphasis added).

¶66 In fact, we have previously stated that "by enacting Wis. Stat. § 971.08(1)(c) & (2), Wisconsin codified the protections contemplated in Padilla, but placed the duty to warn on the circuit court, rather than solely on the attorney." Negrete, 343 Wis. 2d 1, ¶34 n.12 (emphasis added). That statute, upon which the Padilla Court relied, provides:

> Before the court accepts a plea of guilty or no contest, it shall . . . [a]ddress the defendant personally and advise the defendant as follows: "If you are not a citizen of the United States of America, you are advised that a plea of guilty or no contest for the offense with which you are charged may result in deportation, the exclusion from admission to this country or the denial of naturalization, under federal law."

Wis. Stat. § 971.08(1)(c) (2005-06) (emphasis added). The legislature adopted § 971.08(1)(c) in 1985. See 1985 Wis. Act 252.

¶67 Accordingly, if Shata's position were correct, then an alien defendant would receive inconsistent immigration warnings when pleading guilty or no contest. The alien's attorney, according to Shata, would be required to tell the alien that a conviction will absolutely result in deportation. However, the

37

circuit court would warn the defendant pursuant to Wis. Stat. § 971.08 that a conviction may result in deportation. Under Shata's logic, if an alien defendant wants to enter a plea, the circuit court would essentially have to act as an immigration lawyer, because to ensure that the plea is knowing, intelligent, and voluntary, the court would have to determine whether defense counsel gave correct immigration advice. Thus, under Shata's logic, in order to ensure that his plea was knowing, intelligent, and voluntary, the circuit court should have told him that he absolutely would be deported upon conviction and that his counsel's advice was incorrect. Circuit courts are not required to inform aliens that they absolutely will be deported upon conviction. See Wis. Stat. § 971.08(1)(c). Moreover, if an attorney were to give the advice that Shata argues is required, the attorney may, in fact, be giving wrong advice. In light of the Padilla Court's reliance on § 971.08, and in light of our view in Negrete that this statute codified the protections of Padilla, we conclude that Padilla did not require Shata's attorney to tell him that his conviction would absolutely result in deportation. Shata's argument is inconsistent with § 971.08. In fact, unlike Padilla's attorney whose advice was absolutely incorrect, Shata's attorney gave him advice that there was a "strong chance" of deportation, which was absolutely correct. Correct advice is not deficient.

¶68 In addition to creating advice from counsel that is inconsistent with the circuit court's immigration warning, if we were to accept Shata's argument, a defendant like Shata would

38

always be in a position to complain that counsel was ineffective whether he was deported or not. Allow us to further explain how Shata's conclusions would open the door for any alien to seek postconviction relief regardless of deportation. Shata argues that if deportation proceedings are subsequently brought against a defendant, like Shata who pled pursuant to an agreement, the defendant should be entitled to withdraw the plea in order to avoid deportation even though that defendant entered the plea knowing that there was a "strong chance" of deportation. Such a defendant would be able to enjoy the benefits of a plea agreement——such as the State's agreement to reduce, dismiss or agree not to file charges and recommendation for a more lenient sentence——and later seek relief if deportation proceedings are commenced even though the defendant knew that there was a "strong chance" of deportation.

¶69 On the other hand, a defendant who, like Shata, is warned that there is a "strong chance" of deportation could gamble by pleading guilty pursuant to an agreement reached with the State. Seemingly then, if deportation proceedings were not brought against the defendant, then the defendant could complain that he should have gone to trial with the hope of receiving a more beneficial verdict from a jury. In other words, Shata could also complain, if not deported, that he gave up his right to a trial because he was told that he faced a "strong chance" of deportation.[18]

---

[18] Perhaps deportation may not come because a sentence
(continued)

¶70 Similarly, consider a defendant who is told that he will absolutely be deported upon conviction and so he proceeds to trial instead of accepting a plea offer. If that defendant is convicted, but is not then deported, should that defendant be allowed postconviction relief because he asserts that if he had not received that advice, he would have taken the State's plea bargain offer instead of proceeding to trial? A defendant in those circumstances very well could have given up a beneficial plea agreement due to counsel's advice that mandatory deportation would occur. As can been seen, Shata's argument seems to hinge on whether a defendant is deported, instead of whether the defendant knew that he was pleading to an offense for which he could face deportation, exclusion from admission, or denial of naturalization. Thus, Shata's argument would entitle him to relief whether he pleads or goes to trial and whether he is deported or not. Padilla did not create such an impossible scenario for the State, counsel, the defendant, or the courts.

¶71 Shata's position——that his attorney was required to tell him that "his conviction would absolutely result in deportation"——is unworkable and untenable. That advice would be

_____

imposed affects deportation, because the DHS has prosecutorial discretion, or perhaps because a change in policy affecting deportation occurs. How certain must counsel be of the likelihood that deportation will occur, considering the immigration legal landscape and changing executive branch or administration policies regarding deportation?

incorrect because a defense attorney does not control and cannot know with certainty whether the federal government will deport an alien upon conviction. If we were to adopt Shata's position, the unintended consequence may be that an alien defendant could be essentially precluded from ever pleading guilty or no contest to a crime. Why would the State make a plea bargain offer to such a defendant knowing that it could almost always be withdrawn? If we adopted Shata's position, then an alien might not ever be able to knowingly, intelligently, and voluntarily plead or even decide to proceed to trial. Padilla requires advice to be correct and, unlike in Padilla, the advice that Shata received was actually correct. Shata's arguments fail because the advice that he received——that there was a "strong chance" of deportation——was correct and accurate and he entered a knowing, intelligent, and voluntary plea with that understanding.

¶72 The case law on which Shata relies is likewise distinguishable. For example, the attorneys in Bonilla and Sandoval rendered assistance that Padilla clearly condemned. The attorney in Sandoval gave wrong advice by telling his client that he would not be deported upon conviction when, in fact, he was deportable. Sandoval, 249 P.3d at 1020. That advice was identical to the advice that Padilla received, and the Padilla Court held that such incorrect advice constitutes deficient performance. Padilla, 559 U.S. at 368-69. In Bonilla the attorney failed to mention anything to the defendant about possible immigration consequences of a conviction. Bonilla, 637

41

F.3d at 984. The Padilla Court held that an attorney must inform an alien client of possible immigration consequences of a conviction. Padilla, 559 U.S. at 369-71.[19] In Mendez defense counsel advised the defendant that "'a conviction may make [the defendant] inadmissible or deportable.'" Mendez, 354 Wis. 2d 88, ¶4 (alteration in original). In Salazar defense counsel advised the defendant that there was "a possibility" of deportation upon conviction. Salazar, 361 S.W.3d at 101. By contrast, Shata's attorney provided correct advice about the immigration consequences of his plea, telling Shata that there was a "strong chance" of deportation upon conviction.

¶73 Bonilla is further distinguishable because the defendant in that case moved to withdraw his plea pre-sentencing, so the Ninth Circuit applied the "fair and just" standard for pre-sentencing plea withdrawal. Bonilla, 637 F.3d at 983. By contrast, because Shata moved to withdraw his plea post-sentencing, we must apply the higher "manifest injustice" standard. See Negrete, 343 Wis. 2d 1, ¶29.

¶74 The cases on which the State relies are much more persuasive and, unlike the cases cited by Shata, the cases cited by the State analyzed Padilla in-depth. See Chacon, 409 S.W.3d

---

[19] The Padilla Court rejected an argument, put forth by the United States as amicus curiae, "that Strickland applies to Padilla's claim only to the extent that he has alleged affirmative misadvice." Padilla, 559 U.S. at 369-71. Unlike the attorney in Padilla, Shata's attorney provided correct advice.

at 533-37; Escobar, 70 A.3d at 840-42. Those courts correctly noted that a conviction for a deportable offense will not necessarily result in deportation. See Chacon, 409 S.W.3d at 534, 536-37; Escobar, 70 A.3d at 841-42. As a result, those courts correctly held that counsel was not required to advise the defendants that they would necessarily be deported upon conviction. See Chacon, 409 S.W.3d at 536-37; Escobar, 70 A.3d at 841-42. The courts correctly determined that the attorneys gave correct advice, as required by Padilla, by advising the defendants that deportation was "likely" or "very likely." See Chacon, 409 S.W.3d at 537 ("very likely"); Escobar, 70 A.3d at 842 ("likely"). Shata received similar and correct advice, that there was a "strong possibility" or "strong chance" of deportation.

¶75 We also disagree with Shata's argument that Attorney Toran performed deficiently by not reading the relevant immigration statutes. The Padilla Court did not hold that an attorney must read those statutes in order to avoid performing deficiently. Rather, the Padilla Court focused on the advice that was given and concluded that the advice was deficient because it was contrary to the clear language of the relevant immigration statutes. See Padilla, 559 U.S. at 368-69. Although Attorney Toran did not specifically read the immigration statutes, he asked several federal prosecutors whether Shata could be deported upon conviction. Attorney Toran also sought to have the State offer deferred prosecution or amend the charge to an offense that carried no risk of

43

deportation, but the State was unwilling to do so. Further, Attorney Toran informed the court at both the plea hearing and sentencing hearing that Shata was concerned that he would be deported. Attorney Toran testified at the Machner hearing that he "know[s] the case Padilla v. Kentucky . . . ." Nowhere in Padilla did the Court state that not specifically reading the immigration statutes is the equivalent of giving misadvice. Most importantly, Attorney Toran gave correct advice when he told Shata that the guilty plea carried a "strong chance" of deportation.

¶76 Under these circumstances, Attorney Toran did not perform deficiently when advising Shata of the risk of deportation. This advice is significantly different than counsel's deficient advice in Padilla. While the advice given in Padilla was that the defendant would not face deportation, the advice given to Shata was correct. Attorney Toran is not deficient for giving correct advice to Shata, even if Shata ultimately is deported. If we were to conclude that counsel was deficient for giving this advice, it would place a defendant like Shata in the position of being able to second-guess a plea decision, even when that decision was knowing, intelligent, and voluntary.

¶77 The bottom line is that an attorney's advice must be adequate to allow a defendant to knowingly, intelligently, and voluntarily decide whether to enter a guilty plea. See Wofford v. Wainwright, 748 F.2d 1505, 1508 (11th Cir. 1984) (citations omitted) ("Because [a guilty plea] is valid only if made

44

intelligently and voluntarily, an accused who has not received reasonably effective assistance from counsel in deciding to plead guilty cannot be bound by his plea."). Attorney Toran "adequately advised [Shata] of the risk of deportation so as to allow [him] to make a knowing and voluntary decision to plead guilty." See Chacon, 409 S.W.3d at 537. In addition to Attorney Toran's advice, the plea questionnaire and the circuit court's immigration warning helped to ensure that Shata entered his guilty plea knowingly, intelligently, and voluntarily. See Neufville, 13 A.3d at 610, 613-14. Shata understood the court's admonition that he could be deported upon conviction. He accepted the plea agreement, entered the plea, and was sentenced to one year of confinement as the State recommended. He did not see fit to complain until about four months later, on March 15, 2013, after he received a letter from the DHS.

¶78 We withdraw any language in Mendez, 354 Wis. 2d 88, that suggests that Padilla requires an attorney to advise an alien client that a conviction for a deportable offense will necessarily result in deportation. The remainder of Mendez retains precedential value. See State v. Ziegler, 2012 WI 73, ¶7 & n.3, 342 Wis. 2d 256, 816 N.W.2d 238.

IV. CONCLUSION

¶79 We conclude that Shata is not entitled to withdraw his guilty plea because he did not receive ineffective assistance of counsel. Specifically, Shata's attorney did not perform deficiently. Shata's attorney was required to "give correct advice" to Shata about the possible immigration consequences of

45

his conviction. <u>Padilla</u>, 559 U.S. at 369. Shata's attorney satisfied that requirement by correctly advising Shata that his guilty plea carried a "strong chance" of deportation. Shata's attorney was <u>not</u> required to tell him that his guilty plea would absolutely result in deportation. In fact, Shata's deportation was not an absolute certainty. Executive action, including the United States Department of Homeland Security's exercise of prosecutorial discretion, can block the deportation of deportable aliens. Because Shata's trial counsel did not perform deficiently, we do not address the issue of prejudice.

*By the Court.*—The decision of the court of appeals is reversed.

46

¶80 ANN WALSH BRADLEY, J. *(dissenting).* In <u>Padilla v. Kentucky</u>, 559 U.S. 356, 360 (2010), the United States Supreme Court determined that defense counsel should have informed his client "that his conviction for drug distribution made him subject to automatic deportation," and that counsel's failure to do so constituted deficient performance.

¶81 This case involves the same type of crime and the same immigration statute at issue in <u>Padilla</u>. It should have the same result.

¶82 Yet, rather than employing a straightforward application of <u>Padilla</u>, the majority conducts a lengthy analysis, making several missteps along the way. I focus here on two errors of substantial consequence.

¶83 First, the majority lowers the professional standard for Wisconsin attorneys below that required by national standards and the United States Supreme Court. It contends that when a client is concerned about immigration consequences of a plea, his attorney need not even look at the statute governing the immigration consequences before providing advice. It states: "we [] disagree with Shata's argument that Attorney Toran performed deficiently by not reading the relevant immigration statutes." Majority op., ¶75.

¶84 Second, in maintaining that an attorney provides effective assistance by advising a client with the same language that a court uses in a plea colloquy, the majority misunderstands <u>Padilla</u>'s holding and conflates the court's

1

obligations under the Fifth Amendment with the obligations of an attorney under the Sixth Amendment.

¶85 Together these errors severely undermine the standards for attorney conduct set forth in Padilla. The probable result is that clients will be left with only vague and incomplete advice about the immigration consequences of entering a plea. Because I am confident that clients deserve more and recognize that Wisconsin attorneys must do better, I respectfully dissent.

I

¶86 The majority's position that an attorney need not even look at the statute governing the immigration consequences at issue before providing advice is untenable. Despite defense counsel's awareness that Shata was "very concerned" about deportation, the majority "disagree[s] with Shata's argument that Attorney Toran performed deficiently by not reading the relevant immigration statutes." Majority op., ¶75.

¶87 An attorney's failure to read the statute governing the immigration consequences of a plea after his client has indicated that deportation is a great concern is a quintessential example of deficient performance. As the United States Supreme Court has explained, "an attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under Strickland." Hinton v. Alabama, 134 S. Ct. 1081, 1089 (2014).

¶88 Strickland v. Washington provides that in determining whether an attorney's performance is deficient, "[t]he proper

2

measure of attorney performance remains simply reasonableness under prevailing professional norms." 466 U.S. 668, 688 (1984). The standard of conduct set by the majority is neither prevailing nor a recognized professional norm.

¶89 The United States Supreme Court sets the standard for performance: it requires an attorney to be familiar with the governing immigration statute before determining how to advise a client.

¶90 In discussing the same statute at issue in this case, the Padilla Court observed that "the terms of the relevant immigration statute are succinct, clear, and explicit in defining the removal consequences for Padilla's conviction." Padilla, 559 U.S. at 368. It stated that "Padilla's counsel could have easily determined that his plea would make him eligible for deportation simply from reading the text of the statute." Id. Given the clarity of the law, the Court determined that the alleged failure of Padilla's attorney to correctly inform him of the immigration consequences of a plea was deficient performance. Id. at 369. In essence, an attorney must read the statute and convey the information it contains to the client.

¶91 National standards for attorney conduct likewise support the need for attorneys to investigate the governing immigration law before providing immigration advice.

¶92 An examination of deficient performance "is necessarily linked to the practice and expectations of the legal community." Padilla, 559 U.S. at 366. Accordingly, "prevailing

3

norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable." Id. (quoting Strickland, 466 U.S. at 688).

¶93 Standard 4-6.3 of the American Bar Association's Standards for Criminal Justice, Prosecution and Defense Functions (4th ed. 2015), states that "[d]efense counsel should investigate and be knowledgeable about sentencing procedures, law, and alternatives, collateral consequences and likely outcomes, . . . and advise the client on these topics before permitting the client to enter a negotiated disposition."

¶94 Likewise, standard 14-3.2 of the American Bar Association's Standards for Criminal Justice, Pleas of Guilty (3d ed. 1999), requires attorneys to investigate the law before advising defendants about pleas. The commentary advises that "defense counsel should be active, rather than passive, taking the initiative to learn about rules in this area rather than waiting for questions from the defendant." Id. at 126-27. Because the immigration consequence of a guilty plea may well be a client's greatest priority, "counsel should be familiar with the basic immigration consequences that flow from different types of guilty pleas, and should keep this in mind in investigating law and fact and advising the client." Id. at 127.

¶95 The performance standard set by the United States Supreme Court and the national standards convey the same message: before advising a non-citizen client on whether to accept a plea, attorneys must investigate the immigration law

4

implicated by the plea. The most basic investigation is to read the governing immigration statute.

¶96 By suggesting that an attorney need not look at and be familiar with the specific governing statute, the majority's standard fails the Strickland test. It is simply unrecognizable as a "prevailing professional norm." Padilla, 559 U.S. at 366.

¶97 Nevertheless, the majority transforms what would be deficient performance elsewhere into acceptable professional conduct here. It puts its stamp of approval on the conduct of Wisconsin attorneys who give substandard legal advice. This is especially troublesome in an area of law that has such significant and life altering consequences for their clients and the clients' families.

II

¶98 A cornerstone of the majority's analysis rests on its erroneous contention that attorneys provide effective assistance when they advise clients with the same language that a court uses in a plea colloquy. It states: "[t]he Padilla Court suggested that an attorney would give reasonably competent advice by providing a warning similar to the one that Wis. Stat. § 971.08 requires a circuit court to give: that an alien's conviction may result in deportation." Majority op., ¶65 (emphasis in original).

¶99 This analysis reveals both a serious misunderstanding of Padilla's holding and conflates the court's obligations under the Fifth Amendment with the obligations of an attorney under the Sixth Amendment. I address each in turn.

5

A

¶100 <u>Padilla</u> addressed the same type of crime at issue in this case and its holding clearly stated what advice should have been given to Shata. However, the majority appears to misunderstand the holding.

¶101 <u>Padilla</u> instructs: "constitutionally competent counsel would have advised him that his conviction for drug distribution made him subject to automatic deportation." 559 U.S. at 360. It explained that "[t]his is not a hard case in which to find deficiency: the consequences of Padilla's plea could easily be determined from reading the removal statute." <u>Id.</u> at 368-69. The Court described the governing immigration statute as "succinct, clear, and explicit in defining the removal consequences [of a controlled substances conviction]." <u>Id.</u> at 368.

¶102 <u>Padilla</u> set forth a test for determining the amount of advice a defense attorney needs to provide. When the immigration consequences are clear, as here, the consequences must be clearly conveyed to the client, and when they are not, more general advice is sufficient:

> When the law is not succinct and straightforward . . . a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences. . . . when the deportation consequence is truly clear, . . . the duty to give correct advice is equally clear.

6

Id. Because Padilla conclusively established that the immigration consequences of a controlled substances offense are clear, Shata should have been given more than general advice.[1]

¶103 Yet, the language in Wis. Stat. § 971.08 that the majority deems sufficient provides only general, equivocal information:

> If you are not a citizen of the United States of America, you are advised that a plea of guilty or no contest for the offense with which you are charged may result in deportation, the exclusion from admission to this country or the denial of naturalization, under federal law.

Wis. Stat. § 971.08. This warning is equivalent to the warning that Padilla permits when the law is not clear. The majority's suggestion that this warning necessarily fulfills an attorney's Padilla obligations ignores the Court's directive that such a warning is unacceptable when more specific advice is available, and ignores Padilla's determination that more specific advice is available when the defendant pleads to a controlled substances crime.

---

[1] Any question about the possible exercise of prosecutorial discretion is answered by a recent memo from the Department of Homeland Security. It lists aggravated felonies, such as illicit trafficking in a controlled substance, as "Priority 1" and states "[a]liens described in this priority represent the highest priority to which enforcement resources should be directed." Jeh Charles Johnson, Polices for the Apprehension, Detention and Removal of Undocumented Immigrants, at 3 (Nov. 20, 2014), available at www.dhs.gov/sites/default/files/publications/14_1120_memo_prosecutorial_discretion.pdf (emphasis added). Once Shata entered his plea, it appears his deportation fate was sealed.

7

¶104 In an attempt to explain why it does not follow Padilla, the majority insists that this case is different because unlike Padilla's attorney, Shata's attorney did not provide incorrect advice. Majority op., ¶58. This distinction reveals a further misunderstanding of Padilla's holding. Padilla directly stated that its holding was not limited to affirmative misadvice from counsel. 559 U.S. at 370. It explained that a contrary holding would lead to "absurd results": "First, it would give counsel an incentive to remain silent on matters of great importance, even when answers are readily available. . . . Second, it would deny a class of clients least able to represent themselves the most rudimentary advice on deportation even when it is readily available." Id. at 370-71. The majority's disregard for the warning required by Padilla in favor of a general warning in a plea colloquy illustrates its misunderstanding of that case.

B

¶105 Additionally, the majority's suggestion that the court's warning pursuant to Wis. Stat. § 971.08 should be the same as an attorney's advice during plea negotiations conflates the distinct roles served by attorneys and the courts.

¶106 The majority repeatedly asserts that attorneys' immigration warnings should match the court's colloquy. For example, in response to Shata's argument that his attorney should have provided more information, the majority states, "if Shata's position were correct, then an alien defendant would receive inconsistent immigration warnings when pleading guilty

8

or no contest." Majority op., ¶67. The majority even suggests that if an attorney were to offer more advice, the court would have to as well: it states "[if Shata was correct then] the circuit court should have told [Shata] that he absolutely would be deported upon conviction . . . . Shata's argument is inconsistent with § 971.08." Id.

¶107 The majority's insistence that the court and a defense attorney give matching warnings fails to recognize that they undertake different roles in relation to a defendant's choice to enter a plea. Defense counsel's role, as dictated by the Sixth Amendment, is to assist the defendant in deciding whether to enter the plea. Padilla, 559 U.S. at 370 (referring to "the critical obligation of counsel to advise the client of the advantages and disadvantages of a plea agreement").

¶108 The court plays a more limited role under the Fifth Amendment of ensuring that the plea is knowing, intelligent and voluntary. See Danielle M. Lang, Padilla v. Kentucky: The Effect of Plea Colloquy Warnings on Defendants' Ability to Bring Successful Padilla Claims, 121 Yale L. J. 944, 954 (2012). As the United States Supreme Court has explained, a judge "cannot investigate the facts, advise and direct the defense, or participate in those necessary conferences between counsel and accused which sometimes partake of the inviolable character of the confessional." Powell v. Alabama, 287 U.S. 45, 61 (1932); see also United States v. Batamula, No. 12-20630 (5th Cir. June 2, 2015) ("the Supreme Court has long contrasted the unique and critical obligations of defense counsel during the plea

9

bargaining process with the far more limited role of a district court to ensure a minimally valid guilty plea").

¶109 Precedent clearly establishes that although the role of an attorney and the role of a court overlap, they are not equivalent:

> A district court's duty to ensure a knowing and voluntary plea arises from the Fifth Amendment's guarantee of due process and thus affords defendants a right distinct from the Sixth Amendment right to effective assistance of counsel. While we have recognized the inter-relationship between the two amendments in the context of guilty pleas, we have never suggested that the sufficient protection of one right automatically corrects any constitutional deficiency of the other.

United States v. Akinsade, 686 F.3d 248, 255 (4th Cir. 2012) (internal citations omitted); see also Lang, 121 Yale L. J. at 948 ("these two protections serve complementary but distinct functions in our constitutional structure——neither can replace the other").

¶110 The Supreme Court has been clear that the inquiry into whether an attorney has provided effective assistance of counsel is different from the inquiry into whether a plea is knowing, intelligent, and voluntary:

> The [Padilla] Court made clear that "the negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel." It also rejected the argument made by petitioner in this case that a knowing and voluntary plea supersedes errors by defense counsel.

Missouri v. Frye, 132 S. Ct. 1399, 1406 (2012); see also Lafler v. Cooper, 132 S. Ct. 1376, 1390 (2012) ("An inquiry into whether the rejection of a plea is knowing and voluntary,

however, is not the correct means by which to address a claim of ineffective assistance of counsel.").

¶111 Consistent with that guidance, courts have declined to conclude that the generic warning in a plea colloquy rescues inadequate advice from defense attorneys. See, e.g., United States v. Kayode, 777 F.3d 719, 728 (5th Cir. 2014) ("[A] district court's admonishments are 'irrelevant' in determining whether error has occurred under the first Strickland prong."); Akinsade, 686 F.3d at 255 (finding that a trial court's general admonishment concerning immigration consequences could not cure misadvice by counsel, unless specific); Ortega-Araiza v. State, 331 P.3d 1189, 1196 (Wyo. 2014) ("We find that the district court's generic advisement could not compensate for defense counsel's failure to adequately advise his client as required by Padilla."); Hernandez v. State, 124 So. 3d 757, 763 (Fla. 2012) ("[A]n equivocal warning from the trial court . . . cannot, by itself, remove prejudice resulting from counsel's deficiency."); State v. Sandoval, 249 P.3d 1015, 1020-21 (Wash. 2011) ("[T]he guilty plea statement warnings . . . cannot save the advice that counsel gave."); State v. Favela, 311 P.3d 1213, 1214 (N.M. Ct. App. 2013) ("judicial statements made during the plea colloquy about the immigration consequences of a plea do not cure counsel's deficient representation").

¶112 By suggesting that the warning in Wisconsin's plea colloquy statute is sufficient to fulfill an attorney's responsibility under Padilla, the majority ignores Padilla's holding: when the relevant immigration statute is clear, as

11

here, "constitutionally competent counsel would have advised him that his conviction for drug distribution made him subject to automatic deportation."  559 U.S. at 360.

¶113 The majority's suggestion likewise rings hollow because it fails to recognize the difference between the defendants' Fifth and Sixth Amendment rights.  It conflates the role of an attorney with the role of the court.  The infirmity of the majority's suggestion is exacerbated because it comes at a time when "the importance of accurate legal advice for noncitizens accused of crimes has never been more important." Id. at 364.

### III

¶114 In contrast to the majority, I conclude that Padilla requires more than what the defense attorney did in this case. As discussed above, under Padilla, the amount of information an attorney must provide to a non-citizen client regarding the immigration consequences of a plea is dependent upon how clear the law is:

> When the law is not succinct and straightforward (as it is in many of the scenarios posited by Justice Alito), a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences. But when the deportation consequence is truly clear, as it was in this case, the duty to give correct advice is equally clear.

Padilla, 559 U.S. at 369.

¶115 Padilla explicitly held that the law setting forth the immigration consequences of a conviction relating to a controlled substance is clear: "[8 U.S.C. § 1227(a)(2)(B)(i)]

12

specifically commands removal for all controlled substances convictions except for the most trivial of marijuana possession offenses." Id. at 368. Given the clarity of the law, "constitutionally competent counsel would have advised [Padilla] that his conviction for drug distribution made him subject to automatic deportation." Id. at 360.

¶116 In this case, Shata faced a charge of possession with intent to deliver marijuana, as party to a crime. The state offered to recommend a short sentence if Shata pled guilty to that crime. The plea implicated the same immigration statute that was at issue in Padilla. See 8 U.S.C. § 1227(a)(2)(B)(i) ("Any alien who at any time after admission has been convicted of a violation of . . . any law or regulation of a State, the United States, or a foreign country relating to a controlled substance . . . , other than a single offense involving possession for one's own use of 30 grams or less of marijuana, is deportable.").

¶117 Because the same statute and immigration consequences applied to Shata that applied to Padilla, Padilla's holding applies as well. "[C]onstitutionally competent counsel would have advised him that his conviction for drug distribution made him subject to automatic deportation." Id. at 360. Yet that is

13

not the advice that he gave. Instead, Shata's attorney informed him only that there was a "strong chance" of deportation. [2]

¶118 Advising a client that there is a "strong chance" of deportation is not equivalent to advising that the client is "subject to automatic deportation." The court of appeals addressed this issue in State v. Mendez, 2014 WI App 57, 354 Wis. 2d 88, 847 N.W.2d 895. There, Mendez sought to withdraw his plea, asserting that his counsel had been deficient by failing to tell him the clear deportation consequences of a plea. At the hearing, his attorney testified that he did not tell Mendez that he would be deported, instead he basically reiterated the general warning on the plea questionnaire that a conviction may make Mendez inadmissible or deportable. Id., ¶4.

¶119 In response to Mendez' motion, the State cited Chacon v. State, 409 S.W.3d 529 (Mo. Ct. App. 2013) (as it does here). Id., ¶13. In Chacon, the Missouri court of appeals determined that an attorney's advice to a client that he "would very likely

---

[2] In this case the circuit court made a finding of fact that Shata's attorney told him that "there was a strong likelihood that he would be deported." This appears to be an error. A review of the record reveals that the attorney never used those words. At the plea hearing he told the judge he had informed Shata "that there's a potential he could be deported." Likewise, on direct examination at the Machner hearing, the attorney stated that he did not use the word "mandatory" in informing Shata of the deportation consequences; the word he used was "potential." Then, on cross-examination, the attorney revised his statement: "I advised him prior to the plea that he may be deported, that there's a strong chance that he could be deported." Neither the attorney nor Shata ever testified that the attorney used the phrase "strong likelihood."

be deported and wouldn't be able to come back" was sufficient. After observing Chacon's holding, the Wisconsin Court of Appeals stated explicitly: "We reject Chacon. Its holding is contrary to Padilla's plain statement that 'when the deportation consequence is truly clear . . . the duty to give correct advice is equally clear.'" Id., ¶14 (quoting Padilla, 559 U.S. at 369). In other words, informing a client that deportation is "very likely" is not good enough when deportation is presumptively mandatory.

¶120 I agree with the Mendez court that advising "deportation is very likely" is not the same as advising "deportation is presumptively mandatory." It does not convey the same degree of certainty. Like the advice given in Mendez and Padilla, the advice given to Shata did not meet the prevailing professional norm and constituted deficient performance.

¶121 I turn next to the second part of the Strickland test: whether that deficiency prejudiced Shata. 466 U.S. 668. In this case, the circuit court determined that there was no prejudice as a result of the advice that Shata received. It explained "I don't find Mr. Shata's testimony to be credible today that he would've gone to trial under any circumstance had he known that removal, deportation was a presumptive mandatory."

¶122 The circuit court's analysis of prejudice misses the mark. The test for prejudice when an attorney fails to advise a client about immigration consequences is distinct from other scenarios. It is not whether the defendant would have gone to trial had the defendant received the adequate advice. Rather,

15

the test "in determining whether deficient counsel prejudiced a noncitizen defendant's plea deal is whether 'a decision to reject the plea bargain would have been rational under the circumstances.'" Mendez, 354 Wis. 2d 88, ¶12 (quoting Padilla, 559 U.S. at 372).

¶123 This test recognizes that the ability to remain in the United States may be more important to a defendant than the length of a potential sentence. The desire to avoid deportation can dramatically affect a rational noncitizen's decision to accept or reject a plea offer.

¶124 Therefore, under Padilla's test, a defendant can show prejudice by establishing that it would have been rational to reject a plea offer in hopes of obtaining a different plea offer that would not result in deportation, even if doing so exposes him to a longer sentence. As Mendez acknowledges, "an alien defendant might rationally be more concerned with removal than with a term of imprisonment.'" Mendez, 354 Wis. 2d 88, ¶16 (quoting United States v. Orocio, 645 F.3d 630, 643 (3d Cir. 2011), abrogated in part on other grounds by Chaidez v. United States, 133 S. Ct. 1103 (2013)). Such a defendant might rationally choose to risk a lengthier prison sentence in exchange for another plea offer to an amended charge that does not carry automatic deportation consequences. Indeed, "[i]n numerous post-Padilla cases, courts have concluded that despite the benefit of a great reduction in the length of the potential prison sentence, a rational noncitizen defendant might have

16

rejected a plea bargain and risked trial for the chance of avoiding deportation." Mendez, 354 Wis. 2d 88, ¶16.

¶125 An objective standard is applied to the determination of whether it would be rational to reject a plea bargain. See Bonney v. Wilson, 754 F.3d 872, 884 (10th Cir. 2014); United States v. Fugit, 703 F.3d 248, 260 (4th Cir. 2012); Pilla v. United States, 668 F.3d 368, 373 (6th Cir. 2012); Zemene v. Clarke, 768 S.E.2d 684, 692 (Va. 2015).

¶126 Here, in addition to failing to consider whether a decision to reject the plea bargain would have been rational, the circuit court's discussion of what it thought Shata would have done reveals that it took a subjective approach to the prejudice analysis. Accordingly, the court erred in both employing the wrong test and in applying a subjective standard.

¶127 Under the objective standard we consider the totality of the circumstances. In its brief prejudice analysis, however, the circuit court focused solely on the risk Shata would have faced had he gone to trial: "the risk [Shata] ran had this matter gone to trial and more adverse facts came out, that the Court wasn't necessarily aware of at the time of sentencing, the sentence could've been much longer and a more significant period of incarceration or imprisonment which may ultimately reflect

17

upon a presumptive mandatory removal."[3]  A prejudice analysis should not be so limited.

¶128 Mendez stressed that a defendant facing potential deportation may show that his decision to reject a plea offer would have been rational without showing that he would likely have succeeded at trial.  It provides guidance by listing factors to consider in assessing the totality of the circumstances.  In determining prejudice, the court must consider the length of time a defendant has lived in the United States in comparison to the length of time lived in another country, whether he has married a United States citizen and has a child here, and whether he has a reason to fear harm upon returning to his country:

> Mendez has lived in the United States since he was fourteen years old, longer than he ever lived in Mexico, and is married to a United States citizen here with whom he has a young child—also a United States citizen. He also asserted at the hearing that he fears retribution by his codefendant's family should he be deported to Mexico.  Under Padilla, a court's analysis of prejudice must take those factors into account in measuring whether, properly informed of the automatic, irreversible, and permanent deportation consequences of his plea, Mendez might rationally have rejected the plea bargain in favor of trial despite the risk of four and one-half years of initial confinement.

Mendez, 354 Wis. 2d 88, ¶12.

---

[3] The circuit court's suggestion that the length of incarceration would have affected whether removal was presumptively mandatory was also in error.  Although the length of incarceration is a factor for determining deportation based on general crimes, it is not a factor in determining whether an individual is deportable for having committed a crime relating to a controlled substance.  See 8 U.S.C. § 1227(a)(2)(B)(i).

18

¶129 Here, the circuit court applied the wrong test and failed to consider circumstances relevant to a prejudice determination. Given this failure, a remand to the circuit court for further proceedings on the issue of prejudice is required.

IV

¶130 In sum, the majority erroneously holds that attorneys need not even look at the statute governing the applicable immigration consequence and that attorneys need not give any more advice than that contained in a plea colloquy. These holdings defy precedent.

¶131 The Padilla court well understood that effective assistance of counsel during the plea stage is critical. Padilla, 599 U.S. 356; see also Frye, 132 S. Ct. at 1406; Hill v. Lockhart, 474 U.S. 52 (1985). It emphasized that accurate legal advice about deportation consequences has never been more important and that it often is the most critical consideration for noncitizens:

> The importance of accurate legal advice for noncitizens accused of crimes has never been more important. . . . [D]eportation is an integral part——indeed, sometimes the most important part——of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes.

Padilla, 559 U.S. at 364.

¶132 For the reasons discussed above, I conclude that Shata's attorney's performance was deficient. Because the circuit court failed to employ the proper test and apply the correct standard for prejudice caused by inadequate immigration

19

advice during the plea stage of trial, the correct course of action is to remand to the circuit court for further proceedings to address the issue of prejudice.

¶133 Accordingly, I respectfully dissent.

¶134 I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this dissent.