ANN WALSH BRADLEY, J.
¶ 73. (dissenting). I agree that the criminal conduct described by the majority is heinous. If we were called upon as a court to condemn such conduct, I am confident that there would be immediate and unanimous condemnation.[1]
¶ 74. Our task in this review, however, is not to assess the defendant's conduct. Rather, we are called upon to analyze and apply a rule of law.
¶ 75. At issue is whether LeMere's counsel should have advised him that he is automatically eligible for involuntary, indefinite civil commitment *664 after serving his criminal sentence. The precise issue is whether the Sixth Amendment requires defense counsel to inform a client about the possibility of civil commitment, under Wis. Stat. Chapter 980, when the client enters a plea to a qualifying sexually violent offense.
¶ 76. The majority concludes that "LeMere's assertion that his counsel never informed him about the possibility of civil commitment under Chapter 980 does not form the basis for a claim of ineffective assistance of counsel." Majority op., ¶ 71.
1 77. In reaching its conclusion, the majority fails to recognize that like the deportation consequences analyzed in Padilla v. Kentucky, 559 U.S. 356 (2010), a Chapter 980 commitment is a particularly severe and automatic penalty of a guilty plea that is closely connected to the criminal process. Its elimination of procedural protections results in indefinite and even permanent civil commitment. And like deportation, upon entry of a guilty plea there is automatic eligibility for this severe consequence.
f 78. Contrary to the majority, I conclude that the Sixth Amendment requires counsel to advise a client of the consequence of Chapter 980 commitment. I would reverse the court of appeals and remand to the circuit court for an evidentiary hearing.[2] Accordingly, I respectfully dissent.
*665 I — I
¶ 79. The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the assistance of counsel. This right has been interpreted to mean a defendant is entitled to the effective assistance of competent counsel. See, e.g., Strickland v. Washington, 466 U.S. 668, 686 (1984). The right to effective assistance of counsel extends to the negotiation of a plea agreement. Hill v. Lockhart, 474 U.S. 52, 57 (1985). Effective assistance of counsel requires that the defendant be provided sufficient information upon which to make a knowing and intelligent plea. See id. at 56.
¶ 80. Prior to Padilla, courts "almost unanimously concluded that the Sixth Amendment does not require attorneys to inform their clients of a conviction's collateral consequences, including deportation." Chaidez v. U.S., 133 S. Ct. 1103, 1109 (2013). Defense counsel's only obligation was to advise clients of direct consequences of conviction.[3] Id.
¶ 81. Padilla, however, presented a paradigm shift. In Padilla, the Supreme Court determined that the Sixth Amendment requires counsel to provide advice to a criminal defendant about the risk of deportation arising from a guilty plea. 559 U.S. at 366.
1 82. Although Padilla did not eliminate the collateral/direct consequence test generally, it rejected *666 the application, concluding that deportation's close connection to the criminal process makes it uniquely difficult to classify as either a direct or collateral consequence. Id. at 365-66; see also Chaidez, 133 S. Ct. at 1112. The Padilla court explained that deportation, although technically a civil proceeding, is a particularly severe penalty and that eligibility for deportation is nearly automatic for non-citizen offenders. 559 U.S. at 365-66.
f 83. Following Padilla's analysis, we examine whether Chapter 980's close connection to the criminal process makes it uniquely difficult to apply a collateral-direct analysis. As in Padilla, the determination rests on an examination of the severity of the penalty and the nearly automatic eligibility for deportation.
HH hH
¶ 84. The majority concludes that the consequence of a Chapter 980 commitment "does not rise to the level of implicating the constitutional interest set forth in Padilla." Majority op., ¶ 70. In its effort to distinguish involuntary civil commitment from deportation, the majority contends that "LeMere overstates, to a degree, the severity of Chapter 980 commitment." Majority op., ¶ 52.
¶ 85. Before embarking on a legal analysis of the severity of the consequence of Chapter 980 commitment, I pause to observe that this is not merely a matter of legal analysis, it is also one of common sense. The Sixth Amendment guarantees the right to effective assistance of counsel. To be effective, counsel must provide sufficient information to enable the defendant to make a knowing and intelligent plea.
*667 ¶ 86. When assessing whether to accept a plea agreement, would a defendant want to be informed that upon entering the plea, he faces the consequence of a possible lifetime civil commitment after serving his criminal sentence? Of course!
¶ 87. I agree with the sentiment expressed by Justice Gableman at oral argument that the severity of Chapter 980 commitment is essentially a given here. In transitioning the focus from the severity inquiry to the automatic eligibility part of the analysis, he commented:
Justice Gableman: "The part of this case that jumps out to me is not the severity of the possible consequence. I don't think anyone could argue about the severe restrictions on the liberty of the person committed under Chapter 980.
¶ 88. Nevertheless, the majority endeavors to persuade the reader that Chapter 980 consequences are really not all that severe. Relying on the procedural protections of Chapter 980 proceedings, the majority determines that Chapter 980 commitment is not as severe a penalty as deportation because the commitment is not necessarily permanent and does not always last for a lifetime. Majority op., ¶ 55.
rH HH hH
¶ 89. The majority errs in its attempt to minimize the severity of a Chapter 980 commitment. Not only does it run afoul of common sense, it turns a blind eye to the parallel punitive trajectories of deportation and Chapter 980 commitment. In both, important procedural protections under the statute have been eliminated. Similarly, the consequences for both are severe, and may even last for a lifetime.
*668 ¶ 90. As we saw in Padilla, the elimination of procedural protections may heighten the severity of a civil proceeding to such an extent that counsel has an obligation under the Sixth Amendment to advise a client about the consequences of a guilty plea. Just as the legislature eliminated important procedural protections from Chapter 980, important procedural protections that minimized the risk of deportation were eliminated from federal immigration law. See Padilla, 559 U.S. at 360-64.
¶ 91. In the past, federal immigration law "included a critically important procedural protection to minimize the risk of unjust deportation." Id. at 361. Under prior law, the sentencing judge in both state and federal prosecutions had the power to make a recommendation against deportation. Id. This procedure, known as judicial recommendation against deportation ("JRAD") was eliminated in 1990. Id. at 362-63. In 1996, the Attorney General's authority to grant discretionary relief from deportation was also eliminated. Id. at 363. The Padilla court explained, " [t]hese changes to our immigration law have dramatically raised the stakes of a noncitizen's criminal conviction." Id. at 364.
¶ 92. Similarly, over the years, "the legislature has steadily chipped away at those aspects of chapter 980 upon which we relied in determining that the statute was constitutional." In re Commitment of West, 2011 WI 83, ¶ 123, 336 Wis. 2d 578, 800 N.W.2d 929 (Bradley, J., dissenting). As previously explained, the elimination of important procedural protections from Chapter 980 has made it easier to commit an individual, the nature of the commitment is now more restrictive, and the duration of institutionalization is longer. Id. Accordingly, "chapter 980 increasingly resembles a punitive scheme." Id., ¶ 129.
*669 ¶ 93. It is now easier to commit an individual under Chapter 980 than in the past because a jury-must conclude only that it is "likely" an individual will engage in acts of sexual violence. Wis. Stat. § 980.01(7) (2013-14). When Chapter 980 was first enacted, a jury was required to find beyond a reasonable doubt that it was "substantially probable that the person will engage in acts of sexual violence." Wis. Stat. § 980.01(7) (1993-94).
¶ 94. Additionally, the nature of the commitment has become more restrictive. When Chapter 980 was enacted, a commitment order could specify "institutional care in a secure mental health unit or facility . . . or other facility or supervised release." Wis. Stat. § 980.06(2)(b) (1993-94). The nature of the commitment is more restrictive today because the requirement that the Department of Health Services ("DHS") commit an individual in the "least restrictive manner" has been eliminated. Now, a commitment order "shall specify that the person be placed in institutional care," and the DHS "shall place a person committed under s. 980.06 at the secure mental health facility." Wis. Stat. §§ 980.06, 980.065(lm) (2013-14).
¶ 95. Today, the duration of institutionalization at the outset is also longer because reexamination need not occur until twelve months after initial confinement Wis. Stat. § 980.07(1) (2013-14). When the statute was first enacted, DHS was required to reexamine committed persons "within 6 months after an initial commitment." Wis. Stat. § 980.07(1) (1993-94). The erosion of procedural protections has raised the stakes of a defendant's guilty plea as the length of commitment and the number of individuals committed continue to increase.
*670 ¶ 96. Historical data on Chapter 980 indicates that the number of individuals committed under the statute has grown well beyond expectation. When Chapter 980 was enacted in 1994, it was " [a]nticipated at the time of adoption that the program would be small." Deborah McCulloch, Sand Ridge Secure Treatment Center: History of Chapter 980 at 14.[4] After implementation, however, "commitment rates significantly exceeded expectations." Id. at 15. By 2001, Sand Ridge Secure Treatment Center, the entity responsible for detaining individuals committed under Chapter 980, opened a $39 million facility with another $22 million expansion planned in 2009. Id. at 10.
¶ 97. Not only have commitment rates exceeded expectations, but statistical data indicates that individuals have been subject to indefinite and even lifetime commitment under Chapter 980. In 2004, ten years after Chapter 980 was enacted, the author of Sand Ridge's informational paper on recidivism acknowledged that" [t]o date comparatively few patients have been released . . . David Thornton, Sand Ridge Secure Treatment Center, Wisconsin Dep't of Health Servs., Projecting the Amount of Sexual Recidivism Prevented by the Chapter 980 Program (Wisconsin's Civil Commitment for Sex Offenders) at l.[5] A later study released in 2013 reported that 24 people were discharged "due to death." See State of Wisconsin Department of Health Services, Supervised Release *671 Placements and Expenditures, Legislative Audit Bureau Report 13-12, 13 (Aug. 2013).[6] For the 24 people discharged due to death, Chapter 980 commitment was indeed permanent.
IV.
¶ 98. The majority attempts next to distinguish Chapter 980 commitment from deportation by arguing that it is not as "automatic" as deportation. Majority op., fl 58-65.
¶ 99. It contends that the consequence of deportation is automatic because "if a noncitizen has committed a removable offense . . ., his removal is practically inevitable." Id., ¶ 59 (citing Padilla 559 U.S. at 363-64). In contrast, the majority alleges that "a Chapter 980 petition is not an inevitable consequence of a conviction for a sexually violent offense." Majority op., | 58.
¶ 100. Reaching its conclusion, the majority ignores this court's interpretation of Padilla discussed in an opinion issued just last term. The court in State v. Shata, 2015 WI 74, ¶ 101, 364 Wis. 2d 63, 868 N.W.2d 93, concluded that Padilla did not require Shata's attorney to tell him that his conviction would absolutely result in deportation. Instead, Shata interpreted Padilla to mean that counsel was required to advise the defendant that he was eligible for deportation.
¶ 101. Shata stated " [a]lthough a controlled substance conviction makes an alien 'deportable,' such a conviction will not necessarily result in deportation."[7] *672 Id,., ¶ 59 (internal citation omitted). "Thus, the Court meant that Padilla clearly was deportable under that immigration statute, not that he clearly would be deported." Id., ¶ 61 (citing Com. V. Escobar, 70 A.3d 838, 842 (Pa. 2013)).
¶ 102. Likewise, the majority disregards an essential part of Chaidez that further explains the holding in Padilla as it relates to the automatic nature of the consequence. Chaidez clarified that" [i]n Padilla v. Kentucky, this Court held that the Sixth Amendment requires an attorney for a criminal defendant to provide advice about the risk of deportation arising from a guilty plea." Chaidez, 133 S. Ct. at 1105 (internal citation omitted). In case there was any question about its holding in Padilla, the United States Supreme Court in Chaidez again emphasized that it was the risk of deportation that was the automatic consequence:
While Chaidez's petition was pending, this Court decided Padilla. Our ruling vindicated Chaidez's view of the Sixth Amendment: We held that criminal defense attorneys must inform non-citizen clients of the risks of deportation arising from guilty pleas.
Chaidez, 133 S. Ct. at 1106.
¶ 103. Consequently, the correct focus for our analysis here is the risk of automatic eligibility for Chapter 980 commitment, rather than whether commitment itself is automatic. Eligibility for commitment was the focus employed in People v. Hughes, 983 *673 N.E.2d 439 (Ill. 2012), which is particularly instructive here because it analyzed the very issues we now confront in Wisconsin.
¶ 104. In Hughes, the Illinois Supreme Court concluded "that defense counsel has a minimal duty to advise a defendant who pleads guilty to a triggering offense subject to the provision of the Sexually Violent Persons Commitment Act that he will be evaluated for and may risk involuntary commitment after completing his prison term." Id. at 457. As the Hughes court explained, "it is certain that a person convicted of a sexually violent offense is eligible for commitment and the conviction alone will definitely subject the defendant to a mandatory comprehensive evaluation for commitment nearing the end of his prison term." Id. at 455.
¶ 105. Ignoring our analysis in Shata and the holding in Chaidez, the majority casts away Hughes, explaining: "We disagree with the Hughes court's analysis, which focused on the 'possibility of or 'eligibility for' commitment. Statistics discussed in one case before our court of appeals indicated that no more than 4.5 percent of people convicted of sexually violent offenses are even recommended for commitment proceedings under Chapter 980." Majority op., ¶ 65 (citing State v. Budd, 2007 WI App 245, ¶ 16, 306 Wis. 2d 167, 742 N.W.2d 887).
¶ 106. However, the majority presents no supporting statistics with respect to deportation. In fact, as Shata explained in detail, the United States cannot and does not remove all persons who might be deport-able. Due to prosecutorial discretion, limited resources and the government's removal priorities, there are avenues for non-citizens to avoid deportation. Shata, 364 Wis. 2d 63, ¶ 60 (citing Jeh Charles Johnson, *674 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants, at 2 (Nov. 20, 2014).[8]
¶ 107. Given reduced procedural protections, indefinite and even permanent commitment, as well as automatic eligibility for Chapter 980 commitment, I determine that Chapter 980 is analogous to deportation. It is a uniquely severe and automatic consequence of a criminal plea that is closely connected to the criminal process.
¶ 108. Accordingly, I conclude that under Padilla, the Sixth Amendment required counsel to advise LeMere that upon entering a plea, he was subject to Chapter 980 consequences. In assessing whether to accept the plea, LeMere should have been informed by his counsel that by entering the plea he could face an involuntary — and possible lifetime civil commitment— after completing his criminal sentence.
V.
¶ 109. Although the majority concludes that the Sixth Amendment does not require counsel to advise a defendant regarding Chapter 980 commitment, it recommends that it would be the best practice for counsel to discuss any meaningful consequence of a plea. Majority op., ¶ 70.
¶ 110. Most criminal cases are now resolved by the plea process. Missouri v. Frye, 132 S. Ct. 1399, 1407 (2012). In Frye, the Unites States Supreme Court emphasized defense counsel's important duties and responsibilities in the plea process. Id. The Frye court explained that 94 percent of state convictions are resolved with a guilty plea and that "the negotiation of *675 a plea bargain, rather than the unfolding of a trial, is almost always the critical point for a defendant." Id.
¶ 111. Hughes, 982 N.E.2d at 453, is consistent with a growing national movement toward providing defendants more information about the collateral consequences of conviction.[9] See generally, Symposium Issue: Beyond the Sentence: Collateral Consequences of Conviction, 2015 Wis. L. Rev. 181-420 (2015).[10] For example, the American Bar Association (ABA has assembled a tool by which lawyers and defendants can easily search potential collateral consequences by state and offense type.[11]
*676 ¶ 112. In contrast to the majority, I would follow Hughes and conclude that under Padilla, the Sixth Amendment requires counsel to advise a client regarding the consequence of a Chapter 980 commitment. Accordingly, I respectfully dissent.
¶ 113. I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this dissent.

 LeMere pleaded guilty to first-degree sexual assault of a child under the age of 13, contrary to Wis. Stat. §§ 948.02(l)(e) and 939.50(3)(b). Majority op., ¶ 13. He was sentenced to thirty years of initial confinement, followed by fifteen years of extended supervision. Id., ¶ 17. A "sexually violent offense" that qualifies a defendant for Chapter 980 commitment includes any crime specified in Wis. Stat. 948.02(1). See Wis. Stat. § 980.01(6)(a).

 Pursuant to State v. Machner, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979), a defendant alleging ineffective assistance of counsel is entitled to an evidentiary hearing where trial counsel will testify. The circuit court determines if trial counsel provided ineffective assistance of counsel, and if so, whether it was prejudicial. See Strickland v. Washington, 466 U.S. 668, 687 (1984).

 Typically, a collateral consequence is indirect, does not automatically flow from the conviction, and may depend on the subsequent conduct of a defendant. State v. Brown, 2004 WI App 179, ¶ 7, 276 Wis. 2d 559, 687 N.W.2d 543. In contrast, a direct consequence of a plea has a definite, immediate, and largely automatic effect on the range of a defendant's punishment. State v. Byrge, 2000 WI 101, ¶ 60, 237 Wis. 2d 197, 614 N.W.2d 477.

 Available at: https://wAvw.dhs.wisconsin.gov/sites/ default/files/legacy/SandRidge/InformationalPapers/ 9800verview2014.pdf.

 Available at: https://Avww.dhs.wisconsin.gov/sites/ default/files/legacy/SandRidge/InformationalPapers/ PROJECTINGTHEAMOUNTOFRECIDIVISMSAVEDBY THE980PROGRAMSeptember2004Version.pdf.

 Available at: http://legis.wisconsin.gov/lab/reports/ 13-12full.pdf.

 The term "alien" is used here because I quote directly from Shata. As the Sixth Circuit recognized in Flores v. U.S. *672 Citizenship and Immigration Services, 718 F.3d 548, 551 n.1. (6th Cir. 2013), using the term "alien" to refer to other human beings may be "offensive and demeaning."

 Available at: http://www.dhs.gov/sites/default/files/ publications/14_1120_memo_prosecutorial_discretion.pdf.

 According to the Hughes court, "in recent years several scholars and commentators have brought to light potential problems inherent in a rigid categorical system of distinguishing between direct and collateral consequences, especially in the Sixth Amendment context, given this new landscape and the framework for analyzing claims of ineffective assistance." People v. Hughes, 983 N.E.2d 439, 543-44 (Ill. 2012) (citing McGregor Smyth, From "Collateral" to "Integral": The Seismic Evolution of Padilla v. Kentucky and Its Impact on Penalties Beyond Deportation, 54 How. L.J. 795 (2011); Gabriel J. Chin & Margaret Love, Status as Punishment: A Critical Guide to Padilla v. Kentucky, 25 Crim. Just. 21, 27 — 28 (2010); Jenny Roberts, Ignorance Is Effectively Bliss: Collateral Consequences, Silence, and Misinformation in the Guilty-Plea Process, 95 Iowa L. Rev. 119, 124-25 (2009); Jenny Roberts, The Mythical Divide Between Collateral and Direct Consequences of Criminal Convictions: Involuntary Commitment of "Sexually Violent Predators", 93 Minn. L. Rev. 670, 673 — 77 (2008); Gabriel J. Chin & Richard W. Holmes, Jr., Effective Assistance of Counsel and the Consequences of Guilty Pleas, 87 Cornell L. Rev. 697, 701-02, 712-13 (2002)).

 Available at: http://wisconsinlawreview.org/volume-2015-no-2/.

 See Am. Bar Ass'n, ABA Collateral Consequences, http: II www. abacollateralconsequences. org /.