PER CURIAM.
¶ 1 Adam Demerath appeals a judgment of conviction, entered upon his no-contest pleas, for first-degree sexual assault and attempted burglary. He also appeals an order denying his motion for postconviction relief. Demerath argues his pleas were not knowingly, intelligently and voluntarily entered because the circuit court's plea colloquy was deficient and because he did not actually know the elements of the offenses to which he was pleading. Specifically, he alleges the court failed to apprise him of the definition of "sexual contact" within Wisconsin's sexual assault statute. Demerath also argues he was denied the effective assistance of counsel when he entered his pleas because his attorney failed to provide him with the definition of that phrase.
¶ 2 We reject both of Demerath's arguments because he has failed to demonstrate a manifest injustice warranting plea withdrawal. Following a postconviction hearing at which both Demerath and his attorney testified, the circuit court found that Demerath had been told essentially what "sexual contact" meant-i.e., that the touching was done for the purpose of Demerath's sexual gratification or to humiliate the victim. The court rejected the notion that Demerath was not aware of the definition of "sexual contact," and it also found "highly incredible" Demerath's testimony that he had not touched the victim for his own gratification or to humiliate her.
¶ 3 Demerath does not directly challenge these factual findings on appeal. Accordingly, even assuming the plea colloquy was defective, we agree with the circuit court's conclusion that the State met its burden of showing that Demerath's pleas were nonetheless knowingly, intelligently and voluntarily entered. For the same reason, we reject Demerath's assertion that he was prejudiced by his attorney's alleged failure to provide him with the definition of "sexual contact," as well as Demerath's assertion that he would not have pled no contest had he received that information. We affirm.
BACKGROUND
¶ 4 An Information charged Demerath with first-degree sexual assault by use of a dangerous weapon, burglary while becoming armed, attempted burglary, and strangulation/suffocation. The charges stemmed from two incidents that occurred three years apart on North Rankin Street in Appleton.
¶ 5 The first incident occurred in 2012. The victim awoke to an unidentified male in her residence. The perpetrator entered her bedroom, held a serrated knife to her throat, threatened her, choked her, and touched her pubic area and breast. The victim resisted by crossing her legs and holding them very tightly together, preventing the perpetrator from entering her vagina. When the victim told the perpetrator she had a son, the assailant threatened to kill the son, too. However, the perpetrator fled when he was discovered by the victim's son.
¶ 6 The second incident occurred one evening in 2015. Police apprehended Demerath after he had used a ladder to reach the balcony of an apartment on North Rankin Street. Prior to being apprehended, Demerath appeared to have been using a credit card in an attempt to open a door to the apartment's interior. The apartment belonged to a woman who told police she would occasionally sunbathe on the balcony. Police obtained a sample of Demerath's DNA, which matched the DNA found on a cigar that was recovered from the 2012 crime scene.
¶ 7 Police interviewed Demerath after receiving the DNA results from the State Crime Lab. Demerath admitted that he was the perpetrator in the 2012 incident. Demerath told police that when he entered a room in the apartment and saw a woman sleeping, he took a knife from the kitchen, "rushed in," put the knife to her, and touched her breast. Demerath admitted that "in the back of his mind" he was hoping a specific girl lived in the apartment. Demerath stated it "excite[d]" him to steal something, although it is unclear from the criminal complaint whether he was speaking about the first or second incident.[1] Demerath stated it gave him an "adrenalin[e] rush" knowing he was going to break in. The criminal complaint also alleged that Demerath had admitted to his wife in a recorded jail telephone call that he had "sexually assault[ed] a girl from three years ago."
¶ 8 Demerath entered into a plea agreement with the State. At the plea hearing, he entered no-contest pleas to the first-degree sexual assault and attempted burglary charges. The remaining counts were dismissed and read in at sentencing. Both Demerath and his attorney, Kevin Musolf, signed a Plea Questionnaire/Waiver of Rights form noting that the elements of the crimes to which he was pleading were "[e]xplained by [a]ttorney."
¶ 9 The circuit court conducted a plea colloquy with Demerath prior to accepting his pleas. At the inception of the plea colloquy, the court stated that if it was going to accept Demerath's no-contest pleas, "it needs to be crystal clear that it's done freely, voluntarily, and intelligently. So if at any point it doesn't appear that way, probably we'll go down a different path." For each of the counts to which Demerath was pleading, the court identified the crime and its elements. The court also asked Demerath if he had reviewed with his attorney and understood the elements of each crime and the relevant jury instructions. Demerath responded in the affirmative to each of those questions.
¶ 10 The circuit court then asked Demerath a series of questions intended to ascertain whether his pleas were knowing, intelligent and voluntary. Demerath confirmed he was thirty-four years old and had an associate degree in criminal justice. Demerath also confirmed that he had read and signed the plea questionnaire. He responded affirmatively to the court's question regarding whether he had "read through the entire criminal complaint and the [I]nformation, including all of the details of all four charges[.]" Demerath told the court he had no questions or confusion regarding the four charges.
¶ 11 The circuit court repeatedly asked Demerath whether he had an understanding of the charges against him. The following exchange illustrates the court's efforts:
THE COURT: As you sit here today, is it crystal clear in your mind that you understand the charges to which you are pleading to and the stipulation regarding the read-ins?
[DEMERATH]: Yeah, yes.
THE COURT: Do you have any doubts or reservations regarding understanding those charges, including the read-ins?
[DEMERATH]: No questions.
THE COURT: Okay. All right. Just to be clear because I'm not necessarily asking you whether you had questions, whether you clearly understand all four charges in the [I]nformation including Counts 1 and 3 where you are entering a no[-]contest plea, Counts 2 and 4 that you are allowing to be dismissed and read in?
[DEMERATH]: Yes.
THE COURT: You fully understand those?
[DEMERATH]: Yes, I do.
Later, the court reviewed the plea questionnaire with Demerath. The court specifically asked Demerath whether it was true that his attorney had explained the elements of each offense. Demerath answered in the affirmative.
¶ 12 The circuit court reassured Demerath that it would not inconvenience the court if he wanted to have a jury trial. The court reminded Demerath that, at trial, the jury would have to decide "whether the State can prove its four charges, each element of every charge, beyond a reasonable doubt." Demerath stated he understood. The court then discussed the constitutional rights implicated by Demerath's decision to plead, including his right to confront witnesses against him, his right to present evidence, and his right not to testify. Demerath stated he understood those rights.
¶ 13 Demerath also stated that he had not been pressured or forced to enter his pleas and that he was doing so of his own free will. The court discussed the maximum penalties and sentencing possibilities, including probation and an imposed and stayed sentence. Finally, the court discussed with Demerath the consequences of his pleading to felony crimes, including possible deportation and the losses of his voting rights and his right to possess a firearm. Demerath also acknowledged he had reviewed the discovery materials available to him, and both Demerath and his attorney stipulated that the police reports and criminal complaint provided a sufficient factual basis for his pleas.
¶ 14 After receiving all of the above information, Demerath was twice asked whether he had any questions for the court. He responded in the negative both times. The court also provided Demerath with an opportunity to request a break to talk to his attorney. Demerath declined. Before accepting Demerath's plea, the court provided one last opportunity for Demerath to change his mind about pleading no contest to the two felonies and have the matter set for trial. Demerath requested that the court accept his pleas. In response, the court stated:
Okay. I want to make sure whether it's a month from now, two months from now, whenever we have sentencing, or six months from now, a year from now, five years from now, when you are on probation or in custody somewhere, that you don't seek to withdraw your plea and say, well, the judge didn't explain something to me or my attorney didn't explain something to me. So in regard to the context of that topic, in your heart and in your mind as you sit here today has everything been thoroughly explained to you by your attorney, by the Court and anybody else related to this case?
Demerath responded affirmatively. The court then accepted his pleas, finding that Demerath understood his constitutional rights and the plea process, that there was a factual basis for his pleas, and that his pleas were entered knowingly, intelligently and voluntarily. The court stated that based on Demerath's tone of voice, demeanor, and engagement during the hearing, it was "crystal-clear" that Demerath understood his constitutional rights, the process of the case, and his pleas.
¶ 15 Demerath proceeded to sentencing. The circuit court gave Demerath "high marks for [certain aspects of his] character," noting his education, work ethic, and family involvement. However, the court found the nature of the crimes to be particularly aggravated. The court noted Demerath's wedding had occurred approximately two weeks before the first offense, and the proximity of the two events was "highly alarming and definitely gives us insight into a dark portion of your character, your personality, your thought process that the Court cannot ignore while still giving you credit for many other good things in your life."
¶ 16 The circuit court expressed skepticism at Demerath's explanation that the crimes were spur-of-the-moment decisions to steal property in an attempt to satisfy his need for an "adrenaline rush." The court remarked that while Demerath did not prepare a detailed, written plan, the crimes were premeditated at least insofar as his decision to target those particular North Rankin Street residences. The court also reasoned that the crimes were at least in part sexually motivated, because if Demerath had merely wanted property, he could have taken cash or credit cards that, according to the first victim, were in plain view in the kitchen. The court determined the deterrent effect of a significant penalty was warranted, and it sentenced Demerath to consecutive sentences totaling twenty-three years' initial confinement and twenty-two years' extended supervision.
¶ 17 Demerath was appointed appellate counsel and filed a postconviction motion seeking plea withdrawal on the basis that his pleas were not entered knowingly, intelligently and voluntarily. Demerath alleged that attorney Musolf had not adequately explained the elements of the offenses to which he pled, and therefore his pleas were invalid. Demerath's motion principally relied on his contention that "the plea questionnaire would have been reviewed and signed in the brief period of time between when the jailors brought Demerath to the courtroom and the time that court started." Demerath averred he was unaware of the specific elements of the offense for the charges to which he pled, and he argued the plea questionnaire, attorney Musolf, and the circuit court had all failed to properly inform him of the elements. Demerath asserted that because his sexual-assault offense involved sexual contact as opposed to intercourse, both attorney Musolf and the circuit court were required, but failed, to explain the definition of "sexual contact" within the meaning of the statute. See WIS . STAT . § 940.225(5)(b) (2015-16).[2] Demerath asserted that, if he had been apprised of the "actual elements of the offense of first[-]degree sexual assault while armed with a dangerous weapon and attempted burglary, he would not have entered his plea."
¶ 18 The circuit court held an evidentiary hearing on the postconviction motion. Attorney Musolf testified he received the State's plea offer on December 11, 2015. Demerath had approximately twelve days to consider the offer before the next-scheduled hearing date on December 23, 2015. Musolf testified he had provided Demerath with the discovery materials he obtained from the State, he had gone through the materials with Demerath, and Demerath had the opportunity to ask him questions. Musolf testified that he would have discussed with Demerath any plea offer from the State in the context of the strengths and weaknesses of the case. This discussion included what the State would have to prove with respect to the elements of the offenses.
¶ 19 Demerath established that attorney Musolf had not visited him at the Outagamie County Jail on the date he entered his plea. Rather, Musolf testified he reviewed the plea questionnaire form with Demerath at approximately 8:45 on the morning of the hearing, prior to the court's 9:04 a.m. start time. Musolf had nineteen minutes to go over the plea questionnaire form with Demerath. Musolf testified that, during this time, he would have reviewed the elements of the offenses to which Demerath was pleading, as well as the elements of the read-in offenses, and he would have discussed again the "pros and cons of going to trial." He did not provide an elements sheet or jury instructions for Demerath to review. Rather, Musolf testified he would have discussed the elements of the offenses with Demerath using the criminal complaint and his memory, as informed by his twenty-plus years of experience.
¶ 20 During his direct examination, attorney Musolf stated he did not recall whether he reviewed the jury instruction's definition of "sexual contact" with Demerath on the morning of his plea. During cross-examination, Musolf testified he had discussed the fact that the sexual assault had been charged as involving "sexual contact." The State asked Musolf what he would have told Demerath about the "sexual contact" requirement. Musolf replied:
Well, sexual contact is -- I mean I know the elements, it's that you touched an intimate body part of another, I think I would have just said in this case, because there was no alleging of someone touching him, so I would have just said you touched the intimate body part of another and it was for sexual gratification or degradation.
Musolf was then asked to review WIS JI- CRIMINAL 1200A (2016), which is the jury instruction pertaining to the meaning of "sexual contact" involving the touching of a victim's intimate parts. Musolf agreed that the contents of that jury instruction were "essentially" what he described to Demerath at the time they filled out the plea questionnaire. Additionally, Musolf testified he also explained the elements of attempted burglary to Demerath prior to him entering his plea.
¶ 21 Demerath also testified at the postconviction hearing. He stated that he and attorney Musolf met together before the plea hearing for approximately ten minutes, which he claimed was insufficient time for him to understand what he was doing. Demerath testified that Musolf did not review the jury instructions or the elements of the offenses with him at any time. He claimed he had told the circuit court otherwise during the plea hearing because he did not understand the questions and thought the court was talking about the plea questionnaire.
¶ 22 Demerath subsequently admitted that the three elements of first-degree sexual assault had been described to him. He then said that he believed the State "only had to prove one or two elements" of that crime and that attorney Musolf did not explain what the State would have to prove as he described the strengths and weaknesses of the defense. With respect to the definition of "sexual contact," Demerath asserted "[n]obody ever gave me that element," although Demerath later acknowledged Musolf had discussed that there must have been "intimate touching." Demerath stated he would have "never taken a plea" if he knew of the definition of "sexual contact."
¶ 23 The circuit court also questioned Demerath during the postconviction hearing. The court asked what Demerath thought "sexual contact" meant at the time of the plea hearing. Demerath responded that he thought it meant "[t]ouching of ... another person's body part at that time without consent." Demerath acknowledged he and attorney Musolf had discussed the fact that Demerath had admitted to touching the female victim's breast during the 2012 assault, and that he believed such touching constituted "sexual contact." The court then asked Demerath to clarify what he misunderstood:
Q And why do you believe now that it's not sexual contact?
A I was never aroused, I was never excited as far as when I touched the female. I never meant to degrade anybody or sexually arouse. That's the fourth element, is the one that I'm confused about, I was never given, never questioned about. It was not about the sexual-contact part. I understand that part.
Q What would that intent be?
A I don't have an answer to that.
The court also asked Demerath what he did not understand about the attempted burglary charge. Demerath explained that he did not believe he had committed an "attempt" because he had decided not to complete the burglary just before the officer stopped him.
¶ 24 The circuit court rendered its decision after receiving supplemental briefing from the parties. The court rejected Demerath's argument that he was prejudiced by any deficient performance on attorney Musolf's part. The court found that Demerath had approximately twenty minutes to review the plea questionnaire with Musolf on the morning of his pleas. The court also found that Musolf had earlier discussed the elements of the offenses "in terms of the factual situation of this case and the charging document." The court noted Demerath acknowledged having had such a discussion with Musolf. The court found "not credible" Demerath's assertion that he would not have entered his no-contest pleas if he had known the "full elements" of each offense, including the statutory definition of "sexual contact."
¶ 25 Similarly, the circuit court rejected Demerath's argument that his pleas were not knowing, intelligent and voluntary. It concluded it had satisfied its statutory obligations by ensuring there was a factual basis for Demerath's pleas, and that Demerath understood the nature of the charges against him and the potential penalties associated with his crimes. The court also determined that, even if the plea colloquy was in some way deficient, the State had established by clear and convincing evidence that Demerath's pleas were valid. The court found that attorney Musolf had reviewed the criminal complaint with Demerath, explained the elements of the offenses to him, and discussed the evidence against him, even if he had not read verbatim from the jury instructions. The circuit court also found that "Demerath's testimony about why a fuller explanation of 'sexual contact' and 'attempting' would have changed his plea was self-serving and incredible." Demerath now appeals.
DISCUSSION
¶ 26 When a defendant seeks to withdraw a guilty or no-contest plea after sentencing, he or she must prove by clear and convincing evidence that refusing to allow plea withdrawal would result in a "manifest injustice." State v. Finley , 2016 WI 63, ¶ 58, 370 Wis. 2d 402, 882 N.W.2d 761. The manifest injustice test requires a defendant to show "a serious flaw in the fundamental integrity of the plea." State v. Thomas , 2000 WI 13, ¶ 16, 232 Wis. 2d 714, 605 N.W.2d 836. A defendant can demonstrate a manifest injustice by showing that he or she did not knowingly, intelligently and voluntarily enter the plea. State v. Brown , 2006 WI 100, ¶ 18, 293 Wis. 2d 594, 716 N.W.2d 906. Similarly, a defendant who receives constitutionally inadequate representation related to the entry of the plea may be entitled to plea withdrawal. See State v. Daley , 2006 WI App 81, ¶ 20 n.3, 292 Wis. 2d 517, 716 N.W.2d 146. Here, Demerath argues that he has established manifest injustice on both grounds.
I. Knowing, Intelligent and Voluntary Plea
¶ 27 A plea that is not knowing, intelligent and voluntary constitutes a manifest injustice because such a plea violates fundamental due process. Brown , 293 Wis. 2d 594, ¶ 19. Whether a plea was entered knowingly, intelligently and voluntary is a question of constitutional fact. Id. We will uphold the circuit court's findings of historical fact unless they are clearly erroneous, but we decide de novo whether those facts demonstrate that the defendant's plea was knowing, intelligent and voluntary. Id.
¶ 28 Demerath argues his pleas were not knowing, intelligent and voluntary because the circuit court did not adequately apprise him of the elements of the offenses of first-degree sexual assault and attempted burglary. Demerath concedes the court explained "the majority of the elements of the offense[s]" for first-degree sexual assault by use of a dangerous weapon and attempted burglary.[3] His primary contention is that the court's plea colloquy was deficient because the court failed to define "sexual contact."
¶ 29 When a defendant seeks to withdraw a plea based on an allegedly defective plea colloquy, courts use the procedure set forth in State v. Bangert , 131 Wis. 2d 246, 389 N.W.2d 12 (1986). See State v. Sulla , 2016 WI 46, ¶ 25, 369 Wis. 2d 225, 880 N.W.2d 659. Under Bangert , circuit courts have an obligation to address the defendant personally when entering a guilty or no-contest plea and to undertake a colloquy to ensure the defendant understands the nature of the charge, the constitutional rights he or she is giving up by pleading, and the potential punishment for the crime. Brown , 293 Wis. 2d 594, ¶¶ 33-34 ; see also WIS . STAT . § 971.08. "An understanding of the nature of the charge must include an awareness of the essential elements of the crime." Bangert , 131 Wis. 2d at 267.
¶ 30 If the circuit court fails to fulfill a duty at the plea hearing, the defendant may be entitled to an evidentiary hearing if a subsequent postconviction motion alleges that he or she did not understand an aspect of the plea because of the omission. Brown , 293 Wis. 2d 594, ¶ 36. "Assuming the defendant's postconviction motion is adequate to require a hearing, he may withdraw his plea after sentencing as a matter of right unless the [S]tate can show the plea was entered knowingly, intelligently and voluntarily, despite the deficiencies in the plea hearing." Id.
¶ 31 Here, Demerath's argument for plea withdrawal concerns his alleged confusion or misunderstanding of the nature of the first-degree sexual assault charge. First-degree sexual assault by use of a dangerous weapon is proscribed by WIS . STAT . § 940.225(1)(b). As relevant here, the offense has three elements: (1) the defendant had sexual contact with the victim; (2) the victim did not consent to the sexual contact; and (3) the defendant had sexual contact by use of a dangerous weapon. WIS JI- CRIMINAL 1203 (2002). (R 45:1-2) Demerath does not argue the circuit court failed to advise him of these three elements. Rather, he contends the court erred by not specifically providing the definition of "sexual contact," as that phrase is used in each of the elements.
¶ 32 "Sexual contact" is defined in the sexual assault statute and is the subject of a separate jury instruction, WIS JI- CRIMINAL 1200A (2016). As relevant to Demerath's charge, "sexual contact" means intentional touching by the defendant of the victim's intimate parts, if that intentional touching is done for the purpose of sexually degrading the victim, sexually humiliating the victim, or sexually arousing or gratifying the defendant. WIS . STAT . § 940.225(5)(b) 1.a. It was this definition that Demerath claims not to have known at the time he entered his plea.
¶ 33 During the initial round of briefing in this appeal, Demerath relied upon State v. Bollig , 2000 WI 6, 232 Wis. 2d 561, 605 N.W.2d 199, as authority for the proposition that the definition of "sexual contact" formed an "essential element" of the crime of first-degree sexual assault. In Bollig , our supreme court concluded the defendant had made a prima facie showing that the plea colloquy did not conform to the Bangert requirements. Bollig , 232 Wis. 2d 561, ¶ 51. The State "concede[d] that the circuit court did not inform Bollig of one of the essential elements of his offense" of attempted sexual contact with a child-namely, that the alleged contact was for the defendant's sexual gratification or the victim's humiliation. Id. , ¶¶ 50-51.
¶ 34 Whatever can be said of Bollig and its potential applicability to this case, after briefing was completed in this appeal, our supreme court decided State v. Hendricks , 2018 WI 15, 379 Wis. 2d 549, 906 N.W.2d 666. There, the defendant attempted to withdraw his presentencing guilty plea to child enticement, asserting that "the circuit court's failure to tell him the legal definition of 'sexual contact' at his plea hearing violated WIS . STAT . § 971.08 's requirement that a pleading defendant must understand the nature of the charge." Hendricks , 379 Wis. 2d 549, ¶ 1. Our supreme court concluded "sexual contact" is not an essential element of the crime of child enticement. Id. , ¶ 22. In doing so, however, the court distinguished child enticement from cases involving child sexual assault (including Bollig ), stating:
Because the State must prove sexual contact itself in a child sexual assault case, it makes sense that to understand the nature of the charge, a defendant pleading to sexual assault based on sexual contact must be told the specific statutory definition of sexual contact in WIS . STAT . § 948.01(5).
Hendricks , 379 Wis. 2d 549, ¶ 22. In supplemental briefing, Demerath argues Hendricks supports his position, if not outright requires, that the circuit court should have read him the statutory definition of "sexual contact" before accepting his no-contest plea to first-degree sexual assault.
¶ 35 We need not decide, however, whether Hendricks definitively interpreted Bollig as establishing that the specific variety of "sexual contact" alleged is an "essential element" of the sexual assault offense. In other words, we do not reach the issue of whether a defendant charged with a sexual assault by "sexual contact" must be read the statutory definition of that term in order to understand the nature of the charge. We agree with the State that, even if such a requirement exists and the circuit court therefore failed to conduct an adequate plea colloquy, the State met its burden at the subsequent postconviction hearing of showing, by clear and convincing evidence, that Demerath's plea was entered knowingly, intelligently and voluntarily, despite the deficiency.
¶ 36 In determining whether a manifest injustice warrants plea withdrawal, we look beyond the plea hearing transcript to the "totality of the circumstances." State v. Cain , 2012 WI 68, ¶ 31, 342 Wis. 2d 1, 816 N.W.2d 177. "The totality of the circumstances includes the plea hearing record, the sentencing hearing record, as well the defense counsel's statements ... among other portions of the record." Id.
¶ 37 The transcript of the plea hearing, as well as the record of events that preceded it, contains substantial indicia that Demerath understood the nature of the sexual assault charge. The complaint alleged that Demerath had "sexual contact" with the victim. The probable cause section, which Demerath stipulated provided the factual basis for his plea, contained Demerath's admission to his wife that he had "sexually assault[ed] a girl from three years ago." At Demerath's arraignment, attorney Musolf represented that he had reviewed the Information with Demerath, as well as the elements of the charged offenses. Demerath confirmed at the plea hearing that he had read through the complaint and the Information, including all of the details of each of the four charges.
¶ 38 Also at the plea hearing, the circuit court specifically explained to Demerath that he was alleged to have committed the sexual assault by "sexual contact." The court recited the complaint's allegation that Demerath "did have sexual contact" with the first victim on August 19, 2012. The court also posed the following question concerning Demerath's understanding of the nature of the charge: "And the elements involved in first[-]degree sexual assault involve that you had contact with [the victim] on or about the date in question, that that contact was of a sexual nature; and your attorney's gone over the particulars of the jury instruction with you, correct?" Demerath responded in the affirmative. The court repeatedly provided Demerath the opportunity to ask for clarification if there was something he did not understand, or to take a break to speak to attorney Musolf. Demerath declined all of these invitations, and he did not express confusion, apprehension or misunderstanding at any point about the nature of the sexual assault charge.
¶ 39 Attorney Musolf's testimony at the postconviction hearing provided the most compelling evidence that Demerath was advised of, and understood, the specific definition of "sexual contact." Musolf was asked about his notation on the plea questionnaire that the elements of the offenses had been "explained by attorney." Musolf testified he would have discussed with Demerath the strengths and weaknesses of the defense case in the context of what the State would have to prove at trial. Demerath had nearly twenty minutes to review the plea questionnaire with Musolf prior to the hearing. Although Musolf could not recall whether he had specifically reviewed WIS JI- CRIMINAL 1200A with Demerath, he testified that they discussed that the sexual assault had been charged as involving "sexual contact." Musolf explained the definition of "sexual contact" from his memory on the stand, and his explanation was consistent with the jury instruction. Most importantly, Musolf testified that WIS JI- CRIMINAL 1200A's contents were "essentially" what he described to Demerath at the time they filled out the plea questionnaire.
¶ 40 The circuit court's credibility findings play a key role in our analysis. The court disbelieved Demerath's assertion that attorney Musolf had not explained the elements of first-degree sexual assault to him.[4] Rather, the court found credible Musolf's testimony that he would have explained the definition of "sexual contact" to Demerath and that he had essentially explained the information contained in WIS JI- CRIMINAL 1200A.
¶ 41 The circuit court's other credibility determinations are also noteworthy. The court deemed "absurd" and "highly incredible" Demerath's assertion that he did not touch the victim's breast and groin area for sexual gratification or degradation, and it noted Demerath had not provided an alternative explanation of his intent for the touching. Demerath had earlier characterized his conduct as a spur-of-the-moment decision to break in and steal something in an attempt to generate an "adrenaline rush." Even at sentencing, the court expressed skepticism toward this explanation. The court reasonably observed that if Demerath had only wanted to steal something, he could have done so without sexually assaulting the first victim. Moreover, the court deemed Demerath's explanation inconsistent with the fact that he seemingly targeted residences occupied by women.
¶ 42 We will uphold a circuit court's credibility determinations and findings of historical fact unless they are clearly erroneous. State v. Jenkins , 2007 WI 96, ¶ 33, 303 Wis. 2d 157, 736 N.W.2d 24 ; Brown , 293 Wis. 2d 594, ¶ 19. Demerath has not attempted to challenge either aspect of the court's decision. Rather, he relies on his contrary version of events, which the court rejected as incredible. The court's credibility determinations, combined with Demerath's education level, his apparent lack of confusion or misunderstanding at the plea hearing, his repeatedly declining invitations to seek clarification on matters he did not understand, his express affirmation that he had reviewed all elements of the offense with his attorney, and his own admissions both to the police and his wife that he had committed a sexual assault, compel our conclusion that his plea was entered knowingly, intelligently and voluntarily. As such, we agree with the circuit court that Demerath has not demonstrated a manifest injustice warranting plea withdrawal.
II. Ineffective Assistance
¶ 43 Demerath also argues he received ineffective assistance from his trial counsel related to his no-contest plea to first-degree sexual assault.[5] The Nelson /Bentley[6] protocol applies when a defendant alleges that some factor extrinsic to the plea colloquy, like ineffective assistance of counsel, renders a plea invalid. State v. Howell , 2007 WI 75, ¶ 74, 301 Wis. 2d 350, 734 N.W.2d 48. A Nelson /Bentley motion must meet a higher standard for pleading than a Bangert claim, Howell , 301 Wis. 2d 350, ¶ 75, but, here, the circuit court has already held an evidentiary hearing, and we presume the court therefore found Demerath's motion minimally satisfactory, cf. Brown , 293 Wis. 2d 594, ¶ 42.
¶ 44 At a Nelson /Bentley hearing, the defendant has the burden of proving by clear and convincing evidence that a manifest injustice exists warranting plea withdrawal. Brown , 293 Wis. 2d 594, ¶ 42. "Ineffective assistance of counsel is one type of manifest injustice." State v. Shata , 2015 WI 74, ¶ 29, 364 Wis. 2d 63, 868 N.W.2d 93. To demonstrate ineffective assistance of counsel, Demerath must establish both that trial counsel performed deficiently and that the deficient performance prejudiced his defense, which would include performance affecting the decision to plead guilty or no contest. See Strickland v. Washington , 466 U.S. 668, 687 (1984) ; State v. Burton , 2013 WI 61, ¶¶ 47, 50, 349 Wis. 2d 1, 832 N.W.2d 611.
¶ 45 A defendant demonstrates deficient performance by showing that his or her attorney did not provide "reasonably competent" representation. Burton , 349 Wis. 2d 1, ¶ 48. We indulge a strong presumption that counsel rendered adequate assistance. Id. To demonstrate deficient performance, a defendant must point to specific acts or omissions by his or her attorney that were "outside the wide range of professionally competent assistance." Strickland , 466 U.S. at 690.
¶ 46 To demonstrate prejudice, a defendant must establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. Burton , 349 Wis. 2d 1, ¶ 49. "To establish prejudice in the context of a postconviction motion to withdraw a guilty plea based on ineffective assistance of counsel, the defendant must allege that 'but for the counsel's errors, he would not have pleaded guilty and would have instead insisted on going to trial.' " Id. , ¶ 50 (quoting State v. Bentley , 201 Wis. 2d 303, 312, 548 N.W.2d 50 (1996) ).
¶ 47 An ineffective assistance of counsel claim presents a mixed question of fact and law. State v. Ortiz-Mondragon , 2015 WI 73, ¶ 30, 364 Wis. 2d 1, 866 N.W.2d 717. We will uphold a circuit court's findings of historical fact, including the circumstances of the case and counsel's conduct and strategy, unless they are clearly erroneous. Id. "Moreover, this court will not exclude the circuit court's articulated assessments of credibility and demeanor, unless they are clearly erroneous." Id. However, whether trial counsel rendered constitutionally ineffective assistance presents a question of law. Id.
¶ 48 The circuit court's findings related to Demerath's Bangert motion are applicable to his Nelson /Bentley motion as well. See State v. Hoppe , 2009 WI 41, ¶ 64, 317 Wis. 2d 161, 765 N.W.2d 794. Based upon those findings, which are set forth in detail above, we conclude Demerath has demonstrated neither deficient performance nor prejudice. Demerath argues attorney Musolf was deficient for failing to advise him of the definition of "sexual contact," yet this argument is directly contradicted by the court's finding that Musolf provided "essentially" the same information as was contained in WIS JI- CRIMINAL 1200A. Moreover, regarding prejudice, the court rejected Demerath's testimony that he would not have entered his plea if he had known the definition of "sexual contact." The court observed Demerath provided no other explanation for touching the victim's breast and pubic area. Again, Demerath does not challenge these findings as clearly erroneous, and we thus conclude he has failed to demonstrate a manifest injustice warranting plea withdrawal via an ineffective assistance of counsel claim.
By the Court. -Judgment and order affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)5.

At the postconviction motion hearing, Demerath appeared to agree that his statements about getting an "adrenaline rush" from breaking in pertained to the 2015 offense.

All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

Demerath's briefing advances the consistently vague notion that the circuit court did not adequately advise him of the elements of attempted burglary. Upon the State pointing out that Demerath never specified which element or elements the court failed to discuss, Demerath's reply brief clarified that his attack is a broad one, based upon his assertion that "none of the elements for any of the alleged crimes ... were ... adequately addressed by the Court in the plea colloquy."
Our review of the plea hearing transcript shows Demerath's assertion to be patently false. The circuit court advised Demerath that he was being charged with an attempt to intentionally enter a dwelling without consent of the occupant and with the intent to steal. The court specifically observed that Demerath was being charged with an attempted crime under Wis. Stat. § 939.32. Demerath acknowledged that he fully understood the charge and its elements, and that he had discussed the jury instruction for attempted burglary with his attorney.
Because Demerath does not specify how this colloquy was inadequate, we agree with the State that his argument pertaining to the attempted burglary charge is undeveloped. This court will not abandon its neutrality to develop arguments for a party. Industrial Risk Insurers v. American Eng'g Testing, Inc. , 2009 WI App 62, ¶ 25, 318 Wis. 2d 148, 769 N.W.2d 82. We decline to further address Demerath's arguments concerning his no-contest plea to attempted burglary.

This assertion was inconsistent with other portions of Demerath's testimony regarding what attorney Musolf had told him immediately prior to the plea colloquy. Demerath had initially testified that Musolf had not discussed the elements of any of the offenses with him at any time. However, he subsequently testified that Musolf had explained the elements of first-degree sexual assault to him, and that Musolf had told him there must have been "intimate touching." On the whole, Demerath's inconsistent descriptions of what attorney Musolf told him immediately prior to the plea hearing support the circuit court's finding that Demerath's testimony was incredible.

To the extent Demerath attempts to argue he is entitled to withdraw his no-contest plea to attempted burglary based upon ineffective assistance of counsel, we need not address that argument for reasons similar to those set forth previously. See supra , ¶ 29 n.3. In any event, Demerath could not demonstrate prejudice arising from any deficient performance, as the circuit court's plea colloquy adequately advised Demerath of the elements of the offense and he has failed to show that his plea was not made knowingly, intelligently and voluntarily. Id.

See State v. Bentley , 201 Wis. 2d 303, 548 N.W.2d 50 (1996), and Nelson v. State , 54 Wis. 2d 489, 195 N.W.2d 629 (1972).